## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------  x
In re:                                    :     Chapter 7
                                          :
PARK PLACE DEVELOPMENT                     :     Case No. 21-10849 (CSS)
PRIMARY, LLC, ¹                            :
                                          :
                    Alleged Debtor.        :     Re: Dkt. No. 31
----------------------------------------------------------  x
```

### OBJECTION OF THE INVOLUNTARY PETITIONERS TO
### MOTION OF THE ALLEGED DEBTOR PURSUANT TO SECTIONS 303 AND 305 OF
### THE BANKRUPTCY CODE FOR DISMISSAL OF, OR ABSTENTION
### FROM, THE INVOLUNTARY BANKRUPTCY PETITION

Permasteelisa North America Corp. ("**PNA**"), Construction Realty Safety Group Inc.

("**CR Safety**"), Trade Off Plus, LLC ("**Trade Off**"), S&E Bridge & Scaffold LLC ("**S&E**"), and

Ismael Leyva Architect, P.C. ("**ILA**"), the petitioning creditors (collectively, the "**Petitioning**

**Creditors**")² in the above-captioned involuntary chapter 7 bankruptcy case, by and through their

attorneys, Venable LLP, respectfully submit this Objection (the "**Objection**") to the *Motion Of*

*The Alleged Debtor Pursuant to Section 303 and 305 of the Bankruptcy Code For Dismissal of,*

*or Abstention From, the Involuntary Bankruptcy Petition* [Dkt. No. 31] ("**Motion to Dismiss or**

**Abstain**") and respectfully state as follows:

### PRELIMINARY STATEMENT

1.    Prior to July 2014, Sharif El-Gamal ("**Sharif**"), the controlling equity holder and

owner of Park Place Development Primary LLC ("**PPDP**" or the "**Debtor**"), had spent years

trying to acquire real property in lower Manhattan to construct a luxury condominium project

---

¹ The last four digits of the Alleged Debtor's U.S. tax identification number are 1708. The address of the Debtor's corporate headquarters is: 31 West 27th Street, 9th Floor, New York, NY 10001.

² Pursuant to the Notice of Withdrawal of Domani Inspection Services, Inc. As A Petitioning Creditor [Dkt. No. 60] and the supporting Declaration of Adam Eisen attached thereto, Domani Inspection Services, Inc. withdrew as a petitioning creditor.

(the "**Project**") and Islamic cultural center.  In March 2015, after cobbling together three contiguous parcels of property, but lacking funding for the Project, Sharif, in the guise of a then newly-formed entity, Soho Properties Developer LLC ("**Soho**"), filed a Condominium Offering Plan (together with all amendments thereto, the "**COP**") with the Office of the New York State Attorney General seeking approval of the Project and the right to sell condominium units therein. Approval was granted in November 2015, and in April 2016, Sharif obtained financing for the Project from a group of lenders led by a Malaysian bank (collectively, the "**Project Lenders**"), entering into a Building Facility Agreement ("**BFA**") and a Project Facility Agreement ("**PFA**"). The BFA was intended to be compliant with Sharia principles, including the prohibition on the use and/or payment of "interest".  Construction of the Project was significantly delayed and, in 2019, just prior to the maturity date of the "loans" and when the Project was only approximately 65% complete, the Project Lenders called defaults under the BFA and PFA, and in early 2020 commenced a foreclosure action (the "**Foreclosure Action**") against PPDP and others in the Supreme Court of the State of New York, County of New York (the "**New York Court**") (Index No. 850083/2020).  The New York Court has appointed a receiver (the "**Receiver**") to protect the security of the Project.

2.    The Petitioning Creditors have made an extensive review of numerous publicly available documents that provide a glimpse of the complex transactions undertaken by Sharif (and one or more of his controlled entities) to acquire and finance the Project, several of which are reflected in documents that appear to and/or contain false statements, material omissions and/or violate other agreements executed in furtherance of the Project.  Some of these documents include certifications made to the Office of the New York Attorney General in the COP, as well as affidavits and certifications filed with city and state agencies pursuant to Section 275 of the

New York Real Property Law, Section 255 of the New York Tax Law, and Section 22 of the

New York Lien Law. Sharif has dealt with his entities without regard to corporate formalities,

using them as if they were fungible pots of capital resources. At best, Sharif and his entities have

been incompetent in managing the creation, financing and construction of the Project; at worst,

Sharif has knowingly committed acts of deception in order to defraud his and his entities'

creditors, including, but not exclusively, the Petitioning Creditors. It is in this context that the

Petitioning Creditors, in good faith, filed the involuntary chapter 7 petition that commenced this

case in order to protect and preserve the value of the unfinished Project and seek a trustee who

would have the power and authority to expeditiously seek to sell the Project, free and clear of

lien disputes among secured creditors, and investigate, and potentially prosecute, claims arising

out of the Project-related transactions for the benefit of all 85+ creditors of this estate.

     3.   The Foreclosure Action pits the Project Lenders against the Debtor, holders of

mechanics liens and certain taxing authorities. On April 30, 2021, the Debtor filed a motion to

dismiss the Foreclosure Action (not yet briefed by the parties or submitted to the New York

Court for determination), claiming, among other things, that the Project Lenders engaged in acts

constituting lender liability. In addition, on June 9, 2020, the Debtor served and filed a

Summons With Notice on the Project Lenders, alleging, among other things, claims based on

fraudulent inducement, fraudulent misrepresentation, and breach of contract. During a virtual

court hearing held on February 25, 2021, the New York Court (acting by the Hon. Francis A.

Kahn, III, to whom the Foreclosure Action is assigned) advised all counsel that, due to the

crowded calendar of the New York Court, the parties should not expect the court to address

pending dispositive motions, including a pre-discovery motion for summary judgment filed by

the Project Lenders in 2021 (a complex motion which had not yet been briefed by the parties) for

at least a year after such motions were fully briefed and submitted to the court.[3]

4.      Regardless of the outcome of the disputes between the Debtor and the Project

Lenders, the BFA has significant internal inconsistencies that not only fail to comply with Sharia

law principles but may render the Project Lenders' liens and claims avoidable, unenforceable or

void.  For instance, the BFA appears to fail in its attempt to create a *murabaha* arrangement (i.e.,

where no "interest" is charged), and instead created a scenario in which the Project Lenders may

not have "loaned" any money to PPDP and may have no lien under the BFA on proceeds from

the sales by the Debtor of metals it purchased from the Administrative Agent.  Moreover, the

BFA appears to violate the single purpose requirements of this Delaware Debtor's organizational

documents by requiring the Debtor to engage in metal sales transactions and may be

unenforceable by a chapter 7 trustee as an ultra vires act under Delaware law.  Finally, and

perhaps most shocking, on April 26, 2016, when PPDP executed the BFA and issued promissory

notes related thereto, PPDP had no assets and did not own, or have any right to own, the real

property on which the unfinished Project now stands and on which PPDP purportedly granted a

mortgage in favor of the Project Lenders to secure the Project financing.  These defects may

have a substantial effect on recoveries to which *all* of the Debtor's creditors may be entitled (not

just the Petitioning Creditors).[4]

---

[3] No transcript of the February 25, 2021 court hearing appears in the online docket of the New York Court, and it does not appear that any such transcript was made.

[4] In addition to the foregoing infirmities, significant cash in the form of "Retainages" under the BFA seem to be missing or may never have been "funded".  Section 11.5 requires the Obligor/Debtor to retain 10% or other contractually fixed percentages of the cost of construction from the General Contractor and the various trade contractors, subcontractors and material suppliers, and to only disburse these withheld amounts when their work is shown to have been satisfactorily completed.  The Petitioning Creditors believe the Court should know what happened to the Retainage amounts (which likely are several million dollars), and a chapter 7 trustee would be able to investigate whether the Retainage was improperly used by the Debtor or was improperly taken (or never "funded") by the Lenders and should be turned over to the estate.

5.   Shortly after executing the BFA, on May 17, 2016, Sharif, through another one of his entities, Park Place Partners Development LLC ("**Development**"), sought to change the metes and bounds and tax lots of the real property on which the Project was to be located in order to convert the three parcels of property then owned by Development (at this point, PPDP did not own or have any contract to buy any of the property it had purportedly mortgaged to the Project Lenders) into two new tax lots, one ("**New Lot 8**") to eventually be owned by the Debtor for the Project and the other ("**New Lot 9**") to be owned by Development on which the Islamic Cultural Center (the "**ICC**") would be built.  The change created issues for the two entities, however, including the fact that PPDP would require a portion of New Lot 9 to serve as a staging area for construction of the Project (i.e., from which to operate hoists and cranes and on which to store construction supplies).  In an apparent effort to separate ownership of the tax lots but address the usage issues, a Zoning and Lot Development and Easement Agreement (the "**ZLDA**") was also executed on May 17, 2016.  Although various correspondence and pleadings in the Foreclosure Action assume that PPDP is a party to the ZLDA, the available public records indicate that PPDP never executed the ZLDA and nothing in the agreement ever mentions, refers to, or identifies PPDP in any way, much less as a party to the agreement.  Instead, the ZLDA appears to have been executed by Sharif solely on behalf of Development after having negotiated the terms of the ZLDA with himself.  Importantly, the recitals contained in the ZLDA state that *Development, not PPDP*, owned the real property subject to the mortgage that PPDP had granted to the Project Lenders.

6.   The new metes and bounds and new tax lots that PPDP and Development sought to create required New York City regulatory approval.  Prior to obtaining regulatory approval, however, on May 17, 2016, Development executed a deed to New Lot 8 in favor of PPDP (the

property on which PPDP had purportedly granted a mortgage to the Project Lenders), even though, in both instances, the new tax lots had not been approved and the property which Development sold and the Debtor mortgaged did not have the intended metes and bounds.  The sale price for New Lot 8 was $0.00.  The real property included in what became New Lot 8 was already subject to previously filed first and second mortgages in favor of Wellbilt Equipment Corp. ("**Wellbilt**") and 45-51 Park Place LLC ("**Madison Realty**"), respectively.  PPDP assumed neither of these mortgages, nor does it appear that either Wellbilt or Madison Realty timely consented to a transfer of, or a change in, their collateral.

7.    Moreover, as the Project Lenders and Petitioning Creditors first learned in early March 2020, apparently the "unwritten terms" of the ZLDA obligated PPDP to pay to Development at least $4.5 million for the right to use the staging area located on New Lot 9 and an additional $40 million for development rights to the Project. These obligations were kept hidden from creditors and condominium contract parties until early in 2020 when counsel for PPDP forwarded a letter from its affiliate, Development, to the Administrative Agent threatening to terminate the ZLDA and demanding payment of the obligations associated with use of the staging area and the development rights.  Whether the transaction was a good faith, arm's length transaction or a fraudulent, insider deal intended to benefit Development to the detriment of the Debtor and its creditors remains to be determined.

8.    On July 18, 2016, PPDP filed the first amendment to the COP which disclosed that (i) the requisite regulatory approvals for the new tax lots and changed metes and bounds had been obtained and (ii) the existence of the ZLDA, but not the "unwritten terms" described in paragraph 7 above.  The amendment failed, however, to disclose to the New York Attorney General and to interested condominium buyers that Soho, as the Sponsor, did not own the real

estate on which the Project would be built.  Not until late in 2019, as part of the 10th Amendment to the COP, did the New York Attorney General and prospective condominium buyers first learn of the true nature of the ownership of the Project and the "change" of identity of the Sponsor.[5]

9.    The extensive investigation of the public documents made clear to the Petitioning Creditors that the limited scope and authority of the Receiver and the likely long delay in adjudicating disputes in the Foreclosure Action (among a smaller universe of the Debtor's creditors than would otherwise be protected by this chapter 7 case) would not be sufficient to protect the Debtor's assets, minimize deterioration in the value of the Project, and preserve claims that might be owned by the Debtor for the benefit of all creditors - not just the Petitioning Creditors.  Accordingly, the Petitioning Creditors filed the Involuntary Petition on May 24, 2021 (the "**Petition Date**").

10. The Petitioning Creditors believe that they are eligible to file the involuntary petition that commenced this case for the following reasons:

- PNA has an undisputed, unsecured recourse claim against the Debtor in excess of $16,750, because the Debtor, after the PNA Trade Contract was terminated, requested that PNA store and preserve the curtainwall to be furnished for the Project, *at the Debtor's expense,* until the curtainwall was moved.  The Debtor has never removed or transferred the curtainwall to a different storage facility. An accounting and estimate of the actual and future expenses for storage of the curtainwall was given to the Debtor in early 2020 as part of a larger submission of PNA's outstanding claims, and, as of the Petition Date, the Debtor had never

---

[5] *See* Sabin Declaration at **Exh. U** (the 10th Amendment to the COP).  Interestingly, pursuant to the BFA, the COP and all amendments thereto had to be approved by the Administrative Agent prior to the filing thereof.  *See* BFA § 2.1 **Condominium Offering Plan**.

disputed the accounting, estimate and/or actual invoices for storage costs submitted by PNA.  PNA continues to incur costs on behalf of the Debtor in excess of $16,750 for storage of the curtainwall which are not subject to a filed mechanic's lien;

- S&E continues to furnish to the Debtor scaffolding, a sidewalk bridge and a hoist for use at the Project.  With regard to the hoist, S&E has incurred and continues to incur costs on behalf of the Debtor of approximately $28,600.00 per month. S&E has invoiced the Debtor for such costs, has received no objection to such invoices, and, as such, holds an unsecured, fully recourse claim against the Debtor in the amount of not less than $16,750.00;

- ILA has an undisputed, unsecured recourse claim in excess of $16,750 by virtue of its direct agreements with Soho Properties, Inc., as the Debtor's agent, on behalf of the Debtor and waiver of its security interest in a portion of its claim;

- At least one court and one respected commentator acknowledge that a claim against the Debtor's property is a claim against the Debtor for purposes of eligibility under Section 303 of the Bankruptcy Code;

- At least three of the Petitioning Creditors (PNA, S&E, and ILA) are "Major Subcontractors" as that term is defined in section 2.1 of the BFA;[6] as such, all three creditors were intended to be, and are, third-party beneficiary recourse creditors under section 13.1(ee) of the BFA and are owed funds from the Debtor that are independent of, and/or not recoverable under, their mechanics lien; and

---

[6] PNA and S&E each performed subcontract work costing in excess of $5,000,000.00 and ILA is a Design Professional.

- CR Safety and Trade Off, who are both mechanics lienors, are eligible to be petitioning creditors under the Bankruptcy Code and case law in this Circuit, so long as they are not the sole petitioning creditors.

11. Accordingly, the Petitioning Creditors believe, in good faith, that not only is there a proper purpose for the commencement of this chapter 7 case, but that the Petitioning Creditors have met, and will meet, their burden to satisfy the requirements of Section 303(b) of the Bankruptcy Code. [7]  Unlike in the Foreclosure Action, a chapter 7 trustee would be able to expeditiously seek to sell the Project building and related assets (e.g., ZLDA rights, if any), free and clear of disputed liens and claims, with such liens and claims to attach to the sale proceeds and be resolved without jeopardizing the value of the Debtor's assets.  Of equal importance, a chapter 7 trustee would investigate and likely prosecute claims arising from the various documents, transfers and transactions briefly described above (and others) for the benefit of all creditors, not just the Project Lenders or the Petitioning Creditors.  The Petitioning Creditors believe it is only the Bankruptcy Court that would have jurisdiction over all relevant entities and the power to address the myriad of claims arising therefrom, including, without limitation, various avoidance actions, a Delaware *ultra vires* claim to void the BFA obligations, breach of duty claims, fraud and/or conversion claims and the possible substantive consolidation of Sharif and his other controlled entities with the Debtor.  Whether Sharif acted out of ignorance or out of an actual intent to defraud creditors, this Court is the best place to preserve the Debtor's assets

---

[7] Though the Debtor indicates in footnote 8 of its Motion to Dismiss that it has additional *bona fide* disputes concerning the liability and/or amount of the Petitioning Creditors' claims and liens, those alleged, undisclosed disputes must have been asserted at the time of the filing of the Involuntary Petition and not thereafter in an effort to challenge the standing of the Petitioning Creditors.  *See In re EM Equipment, LLC*, 504 B.R. 8, 14 (Bankr. D. Conn. 2013) ("'[U]nder the creditor qualification standards of Section 303(b)(1), the relevant question is whether the claims of petitioning creditors were the subject of a bona fide dispute on the petition date' . . .  Looking back after the petition date and 'discovering' disputed issues, does not give rise to a bona fide dispute as of the petition date," quoting *In re Palace Oriental Rugs*, 193 B.R. 126, 129 (Bankr. D. Conn. 1996)).

and remedy the economic harm that has been, and continues to be, borne by all of the Debtor's creditors.

## <u>BACKGROUND</u>

### <u>The Project</u>

12. Sharif, the beneficial owner and controlling equity holder of the Debtor (and affiliates Development and Soho), is a real estate developer who, prior to 2014, cobbled together three parcels of property in lower Manhattan on which to construct the luxury condominium Project and the ICC.

13. In several transactions, prior to December 2012, affiliates of Soho appear to have purchased all of the parcel designated on the New York County tax map as Block 126, Lot 8 ("**Old Lot 8**") and rights to own or buy, subject, in part, to a 99-year lease, all of the two parcels constituting tax lot Block 126, Lot 9 ("**Old Lot 9**").  On or about July 30, 2014, the Soho affiliates transferred the parcels of property to Development.  A description of the metes and bounds of Old Lot 8 and Old Lot 9 is attached to the three deeds that comprise **Exh. A** (Development Deeds) to the *Declaration of Jeffrey S. Sabin in Support of Involuntary Petitioners' Objection to Motion to Dismissal Of, Or Abstain From, The Involuntary Petition* filed contemporaneously herewith ("**Sabin Declaration**").

14. In December 2012, 43 Park Place LLC ("**Park Place**"), another of Sharif's entities and the then owner of the rights to Old Lot 8,[8] executed a note (the "**Wellbilt Note**") secured by a mortgage (the "**Wellbilt Mortgage**") on Old Lot 8 in favor of Wellbilt in the principal amount of $7 million. On July 29, 2014, Park Place, Development and Wellbilt executed a Mortgage Modification and Assignment Agreement, pursuant to which, among other

---

[8] At the time, 45 Park Place LLC, another of Sharif's entities, owned one of the parcels to Old Lot 9 and held rights as a lessee to the other parcel of Old Lot 9.

things, (i) Park Place paid down $1 million of the outstanding Wellbilt Note, (ii) Wellbilt extended the maturity date of the Wellbilt Note to August 1, 2016, and (iii) Wellbilt consented to Park Place's transfer of Old Lot 8 to Development, subject to assumption by Development of the remaining $6 million Wellbilt Mortgage, and execution of an Intercreditor Agreement permitting Development to grant a $33 million second mortgage on Old Lot 8 in favor of Madison Realty. Sabin Declaration **Exh. B** (Mortgage Modification).

15. The following day, Old Lot 8 and a portion of Old Lot 9 were deeded to Development, and Development purchased the third parcel of Old Lot 9 from ConEdison. Sabin Declaration **Exh. A** (Development Deeds).  On the same day, Development executed a $33 million note in favor of Madison Realty (the "**Madison Note**") which was to be secured by a second mortgage on Old Lot 8 and a first mortgage on Old Lot 9 (the "**Madison Mortgage**"), but which appears to have been, instead, secured by a first mortgage on Old Lot 8 (in violation of the Wellbilt Mortgage) and a second mortgage on Old Lot 9.  Sabin Declaration **Exh**. **C** (Madison Mortgage).  The Madison Mortgage required Development to obtain Madison Realty's consent to transfer either of the parcels securing the Madison Note.  *Id* at Section 10(a) of Exhibit C.

16. A year later, on March 15, 2015, Development entered into a Construction Management Agreement (the "**CMA**") with Gilbane Residential Construction LLC ("**Gilbane**"), a general contracting and construction management company, pursuant to which Gilbane agreed to provide construction management services on the Project. Sabin Declaration **Exh. D** (Construction Management Agreement).

17. Also, on March 25, 2015, Soho filed the COP with the Office of the New York Attorney General (the "**NY Attorney General**").  In the COP, Soho stated that it was the

Sponsor of the Project and owned Old Lot 9, despite the fact that the property was then owned

by Development.  Sharif attested to the veracity of all provisions of the COP.  Sabin Declaration

**Exh. E** (COP).  The COP did not disclose that any financing existed for the Project, presumably

because, at the time the COP was filed and even after the COP was approved by the NY

Attorney General in November 2015, neither Sharif nor any of his entities had secured financing

(or commitments therefor) for the Project.

**The Project Financing**

18.   In 2016, Sharif obtained financing for the Project from a group of lenders led by

Malayan Banking Berhard, New York Branch, a Malaysian bank, and on April 26, 2016, the

Debtor entered into the BFA with the Lenders and executed notes evidencing alleged "advances"

made thereunder.  Under the BFA, the Lenders agreed to "advance" to the Debtor an aggregate

principal amount up to $162,112,896.16 (the "**BFA Loans**"), the proceeds of which were to be

used primarily to finance the Costs of Improvement (as such term is defined in Section 2(5) of

the New York Lien Law) associated with the Project.[9]  Sabin Declaration **Exh. F** (Building

Facility Agreement).

19. At the time the Debtor executed the BFA, it owned no assets and was insolvent.

20. The BFA was intended to comply with principles of Sharia law (*see* BFA §§

3.1(vv) and 13.1(hh)), which means that, among other things, the Lenders could not charge the

Debtor (nor mention) interest for the BFA loans.  Instead, they attempted to create a *murabaha*

arrangement, i.e., a three-part transaction in which (i) the lender or administrative agent

purchases "Metals" from a broker at the borrower's direction, (ii) the lender or administrative

---

[9] The Project Lenders also agreed to advance an additional aggregate principal amount of up to $11,887,103.84
under the PFA, the proceeds of which were to be used to pay soft costs associated with the Project other than the
Costs of Improvement.

agent resells the Metals *to the borrower* at an agreed-upon deferred purchase price that includes

a profit factor, and (iii) *the borrower* would then own the Metals and promptly resell them to a

third-party purchaser to create cash in an amount intended to provide the Debtor with funds

necessary for the construction of the Project.  Under this scenario, *upon resale by the borrower*

of the Metals, the borrower would have cash contemplated to be the "loans" (to be used, in this

case, primarily to pay the Costs of Improvement) and the borrower would be obligated to pay the

deferred purchase price and profit back to the administrative agent on behalf of the lenders in

exchange for these "loans."

21. Unfortunately for the Project Lenders, the definitions of "Transaction" and

"Metals" in the BFA, however, fail to include the cash proceeds part of the three-part

arrangement.  Rather, Section 2.1 of the BFA defines "Transactions" to mean "each purchase of

Metals by Administrative Agent at the request of the Obligor and the subsequent sale of such

Metals by Administrative Agent to the Obligor," and, thus, stops short of including the Debtor's

resale of the Metals to a third-party purchaser and receipt of the proceeds resulting therefrom. [10]

*See* BFA § 2.1 **Transaction**.  Similarly, Section 2.1 defines "Metals" to mean "such metals as

may be purchased by the Administrative Agent for sale to, and acceptance by, Obligor from time

to time in accordance with this Agreement."  This definition does not appear to include metals

sold by the Obligor to a third party. *See* BFA § 2.1 **Metals**.  Thus, a "Transaction" under the

BFA does not create any cash to loan or advance and does not govern or control the cash

---

[10] Section 4.2(b) of the BFA seems, at first glance, to include the sale of Metals by the Debtor to third parties, but the language, again, falls short.  The section provides that "Subject to the limitations herein, (i) Obligor authorizes Trading 2 [metals broker] to enter into Transactions covered by this Agreement including without limitation the sale of Metals by Administrative Agent to Obligor and the on-sale of Metals by Obligor to third parties . . .".  However, by using the phrase, "enter into Transactions covered by this Agreement," the BFA negates sales of Metals by the Debtor to third parties, since the definition of "Transaction" in the BFA does not include such transactions. *See* BFA § 4.2(b).

proceeds of the Debtor's resale of metals to a third-party purchaser; the BFA only governs the Metals that are bought by the Administrative Agent from the third-party seller and sold to the Debtor for a deferred purchase price.[11]

22. Moreover, the Debtor is a single purpose entity organized under Delaware law. *See* BFA § 3.2.  The Petitioning Creditors believe that the Debtor's sole purpose is to own and develop the Project, not to buy and sell "Metals."  Indeed, the definition of "Project" under the BFA does not include a Transaction or sale of Metals.  BFA §2.1 **Project**.  As such, execution of the BFA by the Debtor appears to violate the Debtor's organizational documents and may, therefore, be void under Delaware law as an *ultra vires* act.

23. In addition, section 13.1(ee) of the BFA, which provides that the "Transaction" proceeds must be held in trust for payment of the Costs of Improvement of the Project *in accordance with the New York Lien Law*, appears to fail to comply with applicable lien law, as there simply are no cash proceeds from a "Transaction" and, therefore, it appears there are no trust funds to be held in trust.  *See* BFA § 13.1(ee).

24.  Moreover, it is unclear what happened to significant cash in the form of "Retainages" that were supposed to be held by the Debtor in trust under Sections 11.5 and 13.1(ee) of the BFA. Section 11.5 requires the Obligor/Debtor to retain 10% or other contractually fixed percentages of the costs of construction from the General Contractor and the various trade contractors, subcontractors, and material suppliers, and to only disburse these withheld amounts when their work is shown to be satisfactorily completed.  Further Section

---

[11] Even the Project Lenders appear to recognize that the BFA did not comply with Sharia law, as they argue, in their Motion to Dismiss filed in this case, that the automatic stay should be lifted, because "the Alleged Debtor, with no cash from operations and no unencumbered assets, will not be able to make *interest* payments to the Lenders." *See Motion for Entry of an Order Dismissing the Involuntary Petition Pursuant to 11 U.S.C. §§ 707(a) and 305(a) or, in the Alternative, Granting Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1), (2)* [Dkt. No. 35] ("**Lender's Motion to Dismiss**") at n.6. (emphasis added). If a *murabaha* arrangement had been properly created, there would be no "interest" payments due.

13.1(ee) requires all proceeds to be held in trust for payment of the Costs of Improvement.  The Debtor appears to have exhausted all its funds, but it should be in possession of significant cash in the form of these Retainages.[12]

25. Finally, the Lenders knew that applicable law required the Debtor to complete an Affidavit Pursuant to Section 22 of the Lien Law of the State of New York ("**Section 22 Affidavit**") disclosing, among other things, the consideration paid or to be paid for the building facility.   Exhibit G to the BFA was a form of Section 22 Affidavit provided by the Project Lenders to the Debtor to be completed for filing with the New York County Clerk.   Section 4 of Exhibit G requires disclosure of "the consideration for the Building Facility to be paid and the other expenses heretofore incurred or to be incurred in connection with and paid out of the Building Facility."  The public filing of an affidavit containing the Section 4 language is expressly required by Section 22 of the Lien Law, which provides that a building loan contract must "contain a true statement under oath, verified by the borrower, showing the consideration paid, or to be paid, for the loan described therein, and showing all other expenses, if any, incurred, or to be incurred, in connection therewith. . ."  However, although Exhibit G of the BFA included a space in the prescribed affidavit for inclusion of the "consideration for the Building Facility to be paid and the other expenses incurred in connection with and paid out of the Building Facility . . ." (also described in such space as "Profit"), such information was not included in the Section 22 Affidavit that was actually filed by the Project Lenders as part of the BFA transaction.  The Section 22  Affidavit that was completed by the Debtor, submitted to the Project Lenders and filed with the County Clerk only disclosed that "[t]he portion of the Building Facility to be used to pay consideration for the Building Facilty . . . and the other

---

[12] *See* n.4 *supra.*

expenses heretofore incurred, or to be incurred in connection with and paid out of the Building

Facility are (or are estimated to be) . . . $3,040,548.13," an amount far less than the cost of the

loan facility and related expenses, regardless of whether the cost is labeled profit or interest.[13]

Sabin Declaration **Exh. H** (Section 22 Affidavit).  Thus, the Debtor and the Project Lenders

knew, or should have known, that the Section 22 Affidavit was incorrect and misleading when

the affidavit was signed under oath and publicly filed with the office of the County Clerk.[14]

**Reapportioning the Tax Lots and the ZLDA**

26. By the time the BFA were executed, Sharif apparently decided he wanted or

needed to adjust the metes and bounds of Old Lot 8 and Old Lot 9 so that the Project could fit on

one tax lot and the ICC could fit on the other.  He also apparently wanted the Project and the ICC

to be owned by different entities, not solely by Development which, as of May 2016, still owned

all the parcels of property.  To facilitate these changes, on May 17, 2016, one month after the

BFA was executed, Development (i) submitted an application to New York City agencies

(Department of Finance and Department of Buildings) to reapportion Old Lot 8 (to make the

metes and bounds larger) and Old Lot 9 (to make the metes and bounds smaller) and (ii)

transferred the proposed parcel that would become New Lot 8 to the Debtor (though the

reapportionment had not yet been approved, the metes and bounds had not yet been changed and,

New Lot 8 did not yet exist).  Sabin Declaration **Exh**. **I** (Reapportionment Application) and **Exh.**

**J** (5/12/2016 Deed).

---

[13] Under the BFA, the "Profit Rate" is equal to the one-month LIBOR plus 400 bps (assuming no Event of Default has occurred).  The one-month LIBOR is currently approximately .082.  Thus, assuming a 4.08% interest rate, the $162 million Building Facility would cost over $6.6 million per year.

[14] Section 4 of the filed Section 22 Affidavit is also misleading, as it states that $33 million of the BFA Loans would be used to pay existing financing on the property (presumably the Madison Realty Mortgage), but the Debtor had never assumed the Madison Realty Note. *See* Section 22 Affidavit § 4.

16

27. Moreover, the Real Property Transfer Report to which Sharif certified and that was filed with the New York State Board of Real Property Services listed the sale price for the transaction as $0.00.  The transfer report requires disclosure of the assumption of any debt in connection with the transaction, but no mention was made of any assumption by the Debtor of the Wellbilt Mortgage or the Madison Realty Mortgage that encumbered the property transferred. Sabin Declaration **Exh**. **J** (Real Property Transfer Report) Also, there appears to be no evidence that either mortgagee timely consented to the transfer of the property or the change in the description of their collateral.  What is clear is that, on April 26, 2016, Sharif executed an Affidavit pursuant to Section 255 of the New York State tax law that misrepresented the Debtor as the then owner of the property and the assumption of existing mortgages on the property. Sabin Declaration **Exh. K** (Section 255 Affidavit).

28. Also, on May 17, 2016, Development, as the owner of Old Lot 8 and the adjacent Old Lot 9, entered into the ZLDA.  The ZLDA is a zoning and lot development and easement agreement purportedly between the "residential project owner" and the "museum project (i.e., the ICC) owner," but the definition of both terms, and, therefore, the only party to the agreement, is Development.  The Debtor is neither a party to the ZLDA, nor is it mentioned in the ZLDA. Rather, Sharif signed the ZLDA on behalf of Development as both residential project owner and museum project owner.  Sabin Declaration **Exh. L** (Zoning Lot Development and Easement Agreement).

29. The ZLDA was needed to, among other things, ensure that the Debtor would have access to a construction staging area from which it could locate and operate hoists and cranes and on which it could store construction supplies.  Apparently, as part of execution of the ZLDA, Development and the Debtor allegedly made an unwritten agreement obligating the Debtor to

pay to Development (i) at least $4.5 million for the right to use part of New Lot 9 as a staging area during construction of the Project and (ii) an additional $40 million for development rights to the Project.  When Soho (still claiming to be the Project Sponsor) filed the First Amendment to the COP with the NY Attorney General on or about July 18, 2016, it disclosed the existence of the ZLDA, but failed to disclose the $44.5 million obligation owing by the Debtor to Development. Sabin Declaration **Exh. M** (First Amendment to Condominium Offering Plan).

30. Indeed, these alleged material obligations of the Debtor were kept hidden from the Debtor's creditors and condominium contract parties for nearly four years until early in 2020, when Development sent a letter to the Debtor threatening to terminate the ZLDA and demanding payment of the alleged obligations associated with use of the staging area and the development rights and the Debtor forwarded the letter to the Administrative Agent.  By letter, dated March 5, 2020, the Administrative Agent acknowledged receipt of Development's demand letter, requested documentary evidence of the $44.5 million fee arrangement (of which it was unaware), pointed out that Development and the Debtor were owned and controlled by the same person (Sharif), and alleged that the demand letter was part of a "transparent gambit" to gain leverage in negotiations with the Project Lenders.  Sabin Declaration **Exh. N** (ZLDA Fees Letters).

31. Finally, though the mortgage securing the obligations under the BFA  was executed on either April 26, 2016 or May 17, 2016, the metes and bounds of New Lot 8 did not yet exist, as the application seeking changes to the metes and bounds of Old Lot 8 and Old Lot 9 was first filed on May 17, 2016.  Under the mortgage, the Debtor granted to the Lenders a security interest in New Lot 8, even though New Lot 8 clearly did not exist at the time the mortgage was granted and executed on April 26, 2016 or May 17, 2016.

**Zoning Certification**

32. Just before work stopped on the Project, on October 18, 2019, Development (not the Debtor but controlled by Sharif) filed a Certification (the "**Zoning Certification**") with the New York City Register, Department of Finance, purportedly under Section 37-78 of Article III, Chapter 7 of the Zoning Resolution of the City of New York, to restrict the manner in which the "Property" (defined in the Zoning Certification as New Lots 8 and 9, 43-51 Park Place) may be developed and maintained in the future.  In the Zoning Certification, Sharif represented that *Development (not the Debtor)* was the fee owner of the Property, even though Sharif had represented to the Project Lenders in April 2016 that the Debtor owned the Property, and, most recently, he represented to this Court that the Debtor is the fee owner of the Property. Sabin Declaration **Exh. O** (Zoning Certification, generally).

**The Petitioning Creditors**

33. On April 28, 2016, the CMA between Gilbane and Development was amended and assumed by the Debtor.

34. Thereafter, PNA, CR Safety, Trade Off and S&E, as subcontractors, each entered into a Trade Contractor Agreement with Gilbane (collectively, the "**Contractor Agreements**"), and ILA entered into an architectural service agreement (the "**Services Agreement**") directly with Soho, as the Debtor's authorized agent, on behalf of the Debtor, with the Debtor's consent. *See Involuntary Petition Against A Non-Individual*, Case No. 21-10849 (CSS) [Dkt. No. 1], Exhibits 1, 2, 3, 5 and 6 (Declarations of Petitioning Creditors).  Pursuant to the Trade Agreements and Services Agreement, each Petitioning Creditor undertook to provide labor, services, materials and/or equipment in connection with construction and improvement of the Project.

19

35. Though construction was to start in June 2016, the Debtor suffered a 76-week delay due to concrete and other problems.  Construction resumed in late 2018 but delays and disputes between the Debtor and the Lenders caused construction of the Project to stop on or about November 14, 2019.

36. During the period prior to November 14, 2019 (and in some cases subsequent thereto) each of the Petitioning Creditors provided services or goods to the Debtor in connection with, and for the improvement of, the Project.  Specifically:

    a.  PNA assisted with the design, engineering, manufacture, fabrication and installation of curtainwall, panels, glazing, entryways and similar work;

    b.  CR Safety provided site safety management consulting services in accordance with applicable New York City Building Code requirements;

    c.  Trade-Off provided safety construction and carpentry work;

    d.  S&E provided (and continues to provide) and furnished (and continues to furnish) material and equipment for use at the project consisting of the installation of a hoist, heavy duty platform, roof protection shed, gate, fence, overhead protector, scaffold, sidewalk bridge, start tower and other materials necessary to the Project; and

    e.  ILA provided professional architectural services in connection with the Project.

37.  As stated in its Declaration in Support of the Involuntary Petition, ILA invoiced Soho Properties, Inc., as the Debtor's representative, under the Services Agreement, and, to the extent some payments were made to ILA, it was the Debtor that paid ILA directly for the

services rendered.   Prior to termination of the CMA in December 2019, the other Petitioning

Creditors invoiced Gilbane through their Contractor Agreements.

38. On December 3, 2019, the CMA was terminated for "convenience". Sabin

Declaration **Exh. P** (12/6/2019 Gilbane Letter).

39. By letter, dated December 6, 2019, each of the Trade Contractors was notified

that the CMA had been terminated for convenience and contractors, including the Petitioning

Creditors (other than ILA)**,** were asked to provide final invoices to Gilbane for services and

materials provided under the Trade Agreements to be shared with the Debtor.  *Id.*  In addition, by

separate letter, dated December 6, 2019,  Seth Pomerantz, Executive Vice President of Soho, in

his role "as representative" of PPDP, acknowledged Gilbane's letter and requested that each

contractor attend a meeting with Soho, bringing invoices and supporting documentation with

them, to discuss assignment of the Contractor Agreements to a new contract manager.  Sabin

Declaration **Exh. Q** (12/6/2019 Soho Letter).

40. Each Petitioning Creditor provided either an accounting or a final invoice (or

both) to Gilbane and/or the Debtor for services and/or materials rendered and, upon information

and belief, the Debtor has had an opportunity to review these invoices.  At no time prior to the

Petition Date did the Debtor dispute any of the final invoices submitted to it by the Petitioning

Creditors and each Petitioning Creditor has unpaid claims against the Debtor for services and/or

materials so rendered in excess of $16,750.

41. By letter to Gilbane, dated December 23, 2019, PNA terminated for cause (i.e.,

breach of contract/failure to pay, among other reasons) the PNA Contractor Agreement.  Sabin

Declaration **Exh**. **R** (PNA 12/23/19 Termination Letter).

42. Thereafter, the Debtor sent a letter to Gilbane and PNA's counsel, dated December 24, 2019, in which the Debtor requested that PNA hold and store the curtainwall that it had manufactured for the Project, expressly stating that storage would be *at the Debtor's expense*, until the Debtor transferred the curtainwall to a different storage facility.  Sabin Declaration **Exh. S** (December 24th Letter).  The Debtor has never asked for or removed or transferred the curtainwall to a different facility, and PNA has incurred, and continues to incur, storage costs on behalf of the Debtor for storage of the curtainwall for which PNA has never filed a mechanic's lien.

43. By December 24th, the CMA had been cancelled, the Trade Agreements had been terminated, the Debtor had no direct contract with PNA, and Gilbane had no right to cause PNA to take any direction from it.  By agreeing in the December 24th Letter to be liable for the cost of storing the curtainwall, the Debtor admitted that PNA would have a recourse obligation against the Debtor for all storage costs incurred after December 24, 2019.  To date, PNA has incurred not less than $171,000.00 in curtainwall storage costs for which it remains unpaid, which is not included in a mechanic's lien, and for which the Debtor is liable on a recourse basis. [15]

44. S&E continues to furnish to the Debtor scaffolding, a sidewalk bridge and a hoist for use at the Project.  With regard to the hoist, S&E has incurred and continues to incur costs on behalf of the Debtor of approximately $28,600.00 per month.  S&E has previously sent invoices to the Debtor with respect to the hoist-related costs and has received no dispute or objection to these invoices.  In addition, on December 6, 2019, Soho sent a letter to S&E advising it that Soho

---

[15]PNA cross-claimed against the Debtor in the Foreclosure Action for, among other things, amounts owed to it under the Trade Agreement and for certain curtainwall storage costs under the December 24th Letter.  Sabin Declaration **Exh. T** (PNA Amended Answer and Cross-Claims)  At the latest, the deadline for the Debtor to answer or otherwise move in connection with these cross-claims was May 26, 2021 (which answer or motion would not have been stayed by the filing of the Involuntary Petition) and, yet, the Debtor did not answer, deny, or otherwise object to PNA's cross-claims, thereby waiving its right to dispute the PNA claims against it or, in the alternative, being estopped from asserting any objections thereto.

would be acting as the Debtor's representative in connection with subcontractor issues and requesting copies of S&E's invoices.  Accordingly, S&E previously provided, and continues to provide, copies of invoices to Soho on behalf of the Debtor and has received no objection from Soho to these invoices.  Since the filing of S&E's third  mechanic's lien in February 2021, S&E has incurred hoist-related costs on behalf of the Debtor in an  amount  in an excess of $143,000.00, for which S&E has received no payment and which is not subject to a mechanic's lien. *See Declaration of Thomas J. Garcia in Support of Objection to Motion for Dismissal of, or Abstention from, Involuntary Petition* filed concurrently herewith ("**Garcia Declaration**").

## OBJECTION AND REASONS THEREFOR

45. Despite the Debtor's protestations, the facts related to the Project constitute the quintessential case for the filing of an involuntary chapter 7 petition.  In the Motion to Dismiss or Abstain, the Debtor claims that (i) the Petitioning Creditors are not eligible to be petitioning creditors under Section 303(b) of the Bankruptcy Code because they are mechanics lienors, (ii) the Petitioning Creditors filed the Involuntary Petition for an improper purpose and in bad faith, claiming that bankruptcy is inappropriate where a foreclosure action is pending in which a receiver has been appointed, and (iii) in the alternative, this Court should abstain from hearing, and dismiss, the Involuntary Petition, because the forum in which the Foreclosure Action is pending will somehow better protect the rights of *all* creditors of this estate than would a chapter 7 case with a chapter 7 trustee.  The Debtor's arguments are incorrect and simply ignore reality. Many, many bankruptcy cases start as state court foreclosure actions for the precise reason that only in bankruptcy can all creditors, secured and unsecured, be fully protected, particularly where questionable actions may have been undertaken by the Debtor or its affiliates which can be avoided or remedied by a chapter 7 trustee for the benefit of all creditors.  Given the concerns

23

raised by a review of the numerous public documents in this case, there can be no doubt that the filing of the Involuntary Petition was not only done for a valid bankruptcy purpose and in good faith, but that the *only* way to protect all of the Debtor's more than 85 creditors (and not only the secured lenders and mechanics lienors in the Foreclosure Action) is through adjudication of a bankruptcy case.

### The Petitioning Creditors Are Eligible To File An Involuntary Petition Under Section 303(b) of the Bankruptcy Code

46. Section 303(b) of the Bankruptcy Code permits the filing of an involuntary bankruptcy petition against a person if (i) the petition is filed by at least three or more entities, (ii) each entity is the holder of a claim against such person that is not contingent as to liability or subject to a *bona fide* dispute as to liability or amount, and (iii) the claims must, in the aggregate, be in an unsecured amount of at least $16,750.  11 U.S.C. § 303(b).  As the Debtor points out, the Petitioning Creditors are mechanics lienholders, but they nonetheless satisfy the requirements for filing an involuntary petition against the Debtor for several reasons.

47. At least three of the Petitioning Creditors have direct unsecured recourse claims against the Debtor that are not subject to a *bona fide* dispute and which, in the aggregate, are in excess of $16,750:

a.   ILA has a direct, unsecured recourse claim against the Debtor for architectural services provided to the Debtor under the Services Agreement in connection with the Project.  ILA has invoiced Soho Properties, Inc., as the Debtor's representative, for these services, the Debtor has not disputed these invoices, an unpaid balance remains in an amount not less than $93,571.40, and ILA has waived its security interest in $16,750 of its unpaid claim, leaving it with an undisputed, unsecured recourse claim against the Debtor in excess of the statutory threshold amount.  *See Declaration of Ismael Leyva in Support of Objection to Motion*

*for Dismissal of, or Abstention from, the Involuntary Petition* filed concurrently herewith ("**Leyva Declaration**") at ¶ 5. *See, also East-West Assocs,*, 106 B.R. 767 (S.D.N.Y. 1989) (mechanics lienholders were permitted to waive part of their secured claims to become eligible unsecured petitioning creditors);

        b.   PNA has a direct unsecured recourse claim against the Debtor for curtainwall storage costs incurred (and continuing to incur) after termination of its Trade Agreement that is not included in a mechanics lien.  The December 24th Letter from the Debtor to Gilbane, which was also sent by the Debtor to PNA's counsel, evidences the Debtor's intention to secure their curtainwall that was being stored at PNA's facility at the Debtor's expense. *See Declaration of Sharif El-Gamal In Support of the Motion of the Alleged Debtor Pursuant to Section 303 and 305 of the Bankruptcy Code For Dismissal Of, or Abstention From, the Involuntary Petition* [Dkt. No. 32] ("**Sharif Declaration**") at Exh. 2.  As neither the Debtor nor Gilbane has requested that the curtainwall be removed to another facility, PNA has continued to store the curtainwall and has incurred monthly expenses in connection therewith. At the Debtor's request, PNA provided a final invoice to the Debtor, including the actual and estimated future curtainwall storage costs through June 2020, which has never been disputed.  PNA has incurred, and continues to incur, storage costs on behalf of the Debtor since June 2020 and is owed payment for these storage costs in an amount not less than $171,000.00 for which it has not filed a mechanic's lien, leaving it with an undisputed, unsecured recourse claim against the Debtor in excess of $16,750.00; and

        c.   S&E has a direct unsecured recourse claim against the Debtor for hoist materials that it continues to provide to the Debtor in connection with the Project.  S&E has previously sent invoices to the Debtor with respect to the hoist-related costs and has received no

dispute or objection to these invoices.  There is an unpaid balance for these costs owing by the Debtor to S&E in an amount not less than $143,000.00 for which S&E has not filed a mechanic's lien.  As such, S&E has an undisputed, unsecured recourse claim against the Debtor in excess of $16,750.  Garcia Declaration, generally.

48. In addition, though there are very few cases addressing the issue of whether a claim against property may constitute a claim against an alleged debtor for section 303(b) eligibility purposes, at least one Southern District of New York case and one well-respected commentator on bankruptcy law have found that the better reading of sections 102 and 303(b) of the Bankruptcy Code is that a claim against the Debtor's property is a claim against the Debtor for purposes of eligibility to file an involuntary bankruptcy petition.

49. In *East-West*, the Southern District of New York rejected the bank lenders' arguments that the involuntary petition should be dismissed because the petitioners were mechanics lienholders who had no standing to file an involuntary petition.  The petitioners had waived their security interests in a portion of their claim to satisfy the eligibility requirements, and the court found that the resulting unsecured claims gave them standing to file the involuntary petition.  The court stated, "[t]he Bankruptcy Code makes no distinction between recourse and non-recourse claims; in fact,. . . a 'claim against the debtor' under the Bankruptcy Code. . . includes both claims against the debtor and claims against the property."  *East-West*, 106 B.R. at 771 (citations omitted).

50. Colliers adopts this reasoning as well.  While recognizing that recourse claims present a difficult issue, and acknowledging the *Taberna* case that holds nonrecourse creditors are not eligible to be petitioning creditors, Colliers, nonetheless, concludes that "the better view is that the holder of a nonrecourse claim is a proper petitioner."  *See 2 Collier on Bankruptcy* P

303.09 (2021) (citing *Taberna Pfd Funding IV, Ltd. v. Opportunities II Ltd. (In re Taberna Pfd. Funding IV, Ltd.,)* 594 B.R. 576 (Bankr. S.D.N.Y. 2018)).  The treatise provides two reasons for its view.  First, "the definition of 'claim' includes a 'claim against property of the debtor.'"  Second, even if the creditor cannot be the sole petitioning creditor, "there is no reason it [the nonrecourse creditor] may not be one of three or more petitioning creditors so long as the other creditors satisfy the statutory requirement as to the total amount of their unsecured claims."  The treatise goes on to distinguish *Taberna* by explaining that the court relied on a case that addressed whether a nonrecourse creditor should be counted in determining the number of creditors a debtor has, not whether a nonrecourse creditor is eligible to be a petitioning creditor.  *Id*. at n.8.

51. Furthermore, at least three of the Petitioning Creditors have a recourse claim against the Debtor as a third-party beneficiary under the BFA.  Section 13.1(e) of the BFA provides that "Obligor will, if any mechanic's lien claim is filed or otherwise asserted against the Project ***or any funds due General Contractor or Major Subcontractors*** (each a "Lien" and collectively "Liens") discharge same, by either payment or the posting of a bond . . ."  BFA § 13.1(e) (emphasis added).  The definition of "Major Subcontractor" is "each subcontractor or major supplier performing work or supplying materials, equipment or furnishings costing five million dollars ($5,000,000.00) or more and all Design Professionals." BFA § 2.1 **Major Subcontractor**.  Each of PNA and S&E have performed work and/or supplied materials or equipment costing in excess of five million dollars and is, therefore, a Major Subcontractor for purposes of section 13.1(e) of the BFA.  ILA is also a Major Subcontractor under the BFA, as

the term "Design Professionals" expressly identifies ILA as the "Architect".  BFA § 2.1 **Design Professional** and **Architect**.[16]

52.    Moreover, Section 13.1(ee) requires the Debtor to receive all Transaction proceeds in trust for the benefit of subcontractors in accordance with New York Lien Law, and those subcontractors are third-party beneficiaries of the statutory trust. Under Section 13 of the New York Lien Law, the owner of a building that receives a building loan mortgage becomes the trustee of the mortgage advances and must ***hold the funds for the benefit of subcontractors*** to pay the costs of improvement.  Section 71(4) of the New York Lien Law provides that "[p]ersons having claims for payment of amounts for which the trustee is authorized to use trust assets as provided in this section are beneficiaries of the trust ***whether or not they have filed or had the right to file a notice of lien . . . or recovered a judgment therefor***.  Where an owner becomes obligated to incur an expenditure as part of the cost of improvement, any person to whom he is so obligated is a beneficiary." N.Y. Lien Law § 71(4) (emphasis added).  As such, PNA, S&E and ILA are third-party beneficiaries of the BFA, because, in addition to their status as mechanics lienors, each of them has a recourse claim for funds due to them, and each of them was an intended third-party beneficiary of the trust created under BFA section 13.1(ee).  Accordingly, PNA, S&E and ILA are each eligible to be a petitioning creditor under section 303(b) of the Bankruptcy Code.[17]

---

[16] ILA, having waived a portion of its mechanic's lien, is also due funds of at least $16,750.00 under Section 13.1(e).  Leyva Declaration at ¶ 5.

[17] The Debtor's reliance on *Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 710 (N.Y. 2018) for the proposition that the Petitioning Creditors are not third-party beneficiaries of the BFA is misplaced, as *Dormitory* applies only to general construction agreements, such as the CMA with Gilbane, not loan agreements such as the BFA.  Indeed, the court stated that the holding "reflects the particular nature of construction contracts" and was never meant to apply to any and all contracts related to a construction project.  *Id.* at 710.  *See* also, *In re George Washington Bridge Bus Station Development Venture, LLC*, Case No. 19-13196 (SCC) (Bankr. S.D.N.Y. July 14, 2020) [Dkt. No. 337], aff'd *Tutor Perini Bldg. Corp. v. N.Y. City Reg'l Center (In re George Washington Bridge Bus Station Development Venture LLC)*, 2021 U.S. Dist. LEXIS 146040 (Aug. 4, 2021) (In her bench decision, Judge Chapman held that a general contractor was not a third-party beneficiary of a lease between the Port Authority and

53. While section 21.6 of the BFA contains a negating clause that might appear to govern the agreement, the clause is not a bald, unambiguous restriction on third-party beneficiary status and suggests that, though contractors and subcontractors are not third-party beneficiaries vis-à-vis the Administrative Agent and Project Lenders, they may be third-party beneficiaries vis-à-vis the Debtor. *See Bayerische Landesbank v. Aladdin Capital Management LLC*, 692 F.3d 42 (2d Cir. 2012) (Where negating clause was ambiguous, court was compelled to review other sections of the contract to determine whether certain parties were intended to have third-party beneficiary status). Unlike typical negating clauses, section 21.6 of the BFA is modified at length by a long list of obligations to which the Debtor is liable but for which the Administrative Agent and Project Lenders are expressly disclaiming liability (e.g., claims of contractors and subcontractors) and with respect to which the Administrative Agent and Project Lenders are denying any agency relationship. The section further modifies the negating clause vis-à-vis the Debtor by specifying that "nor shall any payment of funds directly to a contractor or subcontractor or provider of services be deemed to create any third-party beneficiary status or recognition of same by Administrative Agent or Financiers [Project Lenders]," which would be unnecessary if the negating clause were intended to be all-inclusive. BFA § 21.6  Rather, the two-page long additions to the negating clause suggest that the drafters believed it was necessary to protect solely the Administrative Agent and Project Lenders from third-party beneficiary status that was otherwise conferred on certain parties in prior sections of the BFA.[18]

---

the debtor where the lease was executed years before the general construction contract was executed, there was no mention of the general contractor in the lease though other third-party beneficiaries were identified, and section 365 of the Bankruptcy Code did not contemplate that non-parties to a lease would have cure rights that might prevent the debtor from assuming and assigning the unexpired lease.).  Unlike a construction contract or an unexpired lease under section 365, there is nothing particular about the BFA that would argue against the existence of third-party beneficiaries.

[18] The Debtor's contention that, even if the Petitioning Creditors were intended to be third-party beneficiaries, their claims cannot make them eligible, because the Debtor disputes the Project Lenders' claims under the BFA is an absurd argument for which no case authority is cited or exists.  Disputing the *Project Lenders' claims* under the

54. Finally, CR Safety and Trade Off, who are both mechanics lienors, are eligible to be petitioning creditors under the Bankruptcy Code, as case law in this Circuit holds that fully secured creditors may be petitioning creditors so long as they are not the sole petitioning creditors. *Paradise Hotel Corp. v. Bank of Nova Scotia* 842 F.2d 47 (3rd Cir. 1988) (secured creditor may be a petitioning creditor so long as at least one other creditor holds an unsecured claim in an amount not less than the statutory threshold specified in section 303(b)). PNA, S&E and/or ILA each holds an unsecured claim against the Debtor in an amount in excess of the $16,750 statutory threshold, and, as such, CR Safety and Trade Off may also be petitioning creditors in this case.

## The Involuntary Petition Was Filed For a Proper Purpose and in Good Faith

55. It is well-settled that petitioning creditors are presumed to have acted in good faith in filing an involuntary bankruptcy petition, and the debtor has the burden to show, by a preponderance of the evidence, that the petitioning creditors acted in bad faith to dismiss a petition on such grounds. *See In re Forever Green Athletic Fields, Inc.,* 804 F.3d 328, 335 (3d Cir. 2015); *In re Luxeyard, Inc.*, 556 B.R. 627, 642 (D. Del. 2016). In this Circuit, a court must consider the totality of the circumstances in determining whether petitioning creditors acted in bad faith in filing an involuntary petition, including, but not limited to, whether the creditors were statutorily eligible to file, whether the creditors made a reasonable inquiry relevant facts and pertinent law before filing, there was evidence of preferential payments or dissipation of the debtor's assets, the filing was motivated by ill will or a desire to harass, the creditors were

---

BFA is not the same as disputing the *Petitioning Creditors' claims* under the BFA. As of the Petition Date, the Debtor never disputed the Petitioning Creditors' invoices or their final accountings. The fact that both the Project Lenders and the Petitioning Creditors may have claims under the BFA does not mean that by disputing one set of claims, the Debtor is also disputing the other set of claims.

seeking some litigation advantage to the detriment of other creditors and whether the filing was meritorious.  *See Forever Green*, 804 F.3d at 336; *Luxeyard*, 556 B.R. at 641.

56. The Debtor has failed to show by a preponderance of the evidence that the Petitioning Creditors filed the Involuntary Petition in bad faith, nor *can* the Debtor satisfy this standard, as the Involuntary Petition serves the quintessential bankruptcy purpose of preserving the Debtor's assets, including claims against third parties, providing an opportunity to market and sell the stalled Project in an expeditious manner, free and clear of the lien disputes plaguing the Project, and giving a chapter 7 trustee the opportunity to investigate, and/or prosecute claims arising from, the documentary inconsistencies and public misrepresentations made by the Debtor and its affiliates in connection with the Project, all in order to maximize the value of the Debtor's other assets for the benefit of *all* creditors, not just those involved in the Foreclosure Action. The Debtor's request that this Court rely on the Foreclosure Action to remedy its problems is not an attempt to protect creditors, but, rather, an attempt to delay them further in the hopes that it can pull a rabbit out of its hat.  The unfinished Project has sat naked to the elements for almost two years.  If there are to be any miracles for the Debtor, they can happen within the balanced protection of the Bankruptcy Court sooner, rather than later.

57. As the factual recitation contained in this Objection demonstrates, the Petitioning Creditors have undertaken as exhaustive a review of the documentary facts of this case as can be found in publicly filed documents and have researched the pertinent law regarding these facts (e.g., *ultra vires* doctrine under Delaware law, Section 22 of the Lien Law,  *murabaha* arrangements under Sharia law, third-party beneficiary status) as well as the Petitioning Creditors' eligibility under section 303(b) of the Bankruptcy Code.  *See Luxyard*, 556 B.R. at 644 ( "reasonable inquiry" into facts and law sufficient for filing of involuntary petition). The

haphazard and misleading way in which the Debtor and its affiliates have made public disclosures (or the lack thereof), the confusion over which entity owns the Project, and the inconsistencies found in the Debtor's financing documents concerned the Petitioning Creditors and led them to conclude that a bankruptcy petition was more appropriate than the Foreclosure Action under the circumstances.

58. Contrary to the Debtor's protestations, the Petitioning Creditors obtain no litigation or similar advantage over other creditors of this estate by filing the Involuntary Petition.  Indeed, the opposite is true, as only the parties to the Foreclosure Action benefit from remaining in that forum to resolve the Debtor's problems.  Filing the Involuntary Petition was not forum shopping, and if it provides a more expeditious manner in which to address the Debtor's financial problems, than it is more expeditious for all parties concerned, not just the Petitioning Creditors.  Construction on the Project has been stalled for almost two years. As the Project Lenders make clear, the Receiver has limited funds to safeguard the Project, relying solely on the Project Lenders protective advances. *See* Lender's Motion to Dismiss at ¶ 21. Moreover, unlike a chapter 7 trustee, the Receiver is not charged with doing anything to maximize the Project's value.  *See* Sharif Declaration at ¶ 24 and n.4.  Finally, the unique powers and protections afforded a chapter 7 trustee under the Bankruptcy Code would give a chapter 7 trustee the authority to investigate, among other things, what happened to the contractors' Retainage money that should have been withheld in trust until satisfactory completion of their respective scopes of work.  Clearly, this Court is a better forum for the Debtor and its creditors.[19]

---

[19] Indeed, even the Debtor has admitted that if an order for relief is entered in this case, it would most likely convert this case to a chapter 11 case.  *See* Response and Limited Objection of the Alleged Debtor to Lenders' Motion to Dismiss [Dkt. No. 51] at p. 5.

59. The Petitioning Creditors believe, in good faith, that the Debtor, all of its more than 85 creditors, and its estate, including the Project, would be best served by the filing of a chapter 7 case in which a chapter 7 trustee could use the powers and authority granted to it under the Bankruptcy Code to market and sell the Project, resolve inter-creditor disputes, investigate historical discrepancies and wrongful preferential treatment involving the Debtor and its affiliates, and maximize value for all interest holders.  Clearly, the Petitioning Creditors have filed the Involuntary Petition for a legitimate bankruptcy purpose, and the Involuntary Petition should not be denied.

### This Court Should Not Abstain From Entering An Order For Relief In This Case

60. Section 305(a)(1) of the Bankruptcy Code provides that: "[t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if . . . the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1).  This Court recognizes that abstention is a form of extraordinary relief and should only be used in extreme circumstances. *See In re Eht. US. 1*, 2021, Bankr. LEXIS 1477, *39 (Bankr. D. Del. June 1, 2020) ("'abstention under section 305(a) is a power that should only be utilized under extraordinary circumstances,'" citing *Crown Vill Farm LLC v. Arl. L.L.C. (In re Crown Vill Farm LLC)*, 415 B.R. 86, 96 (Bankr. D. Del. 2009)).  The movant bears the burden of proving that the interests of ***both*** the debtor and the creditors would be better served by granting relief under section 305(a) which, according to this Court,  "is [a] substantial burden" and not merely a balancing test. *Id.*

61. The Debtor makes no cogent argument why this Court should abstain from entering an order for relief in this case other than to, again, rely on the Receiver's ability to protect the Project for the time it takes the Foreclosure Action to wind itself through the New

York Court and to claim that there is no bankruptcy purpose to the Involuntary Petition but that the Petitioning Creditors were motivated by their own self-interest in filing it.

62. Construction on the Project has been stalled for almost two years, the Foreclosure Action is also stalled in the New York Court and briefing of pending dispositive motions has not been completed, nor has discovery been taken in the action. The Receiver has limited funds to continue protecting the Project, which the Project Lenders estimate will cost over $689,000 over the next six months alone. *See* Lenders' Motion to Dismiss at ¶ 22. There is simply no judicial economy to be served by relying on the Foreclosure Action.

63. As the Petitioning Creditors make clear in the foregoing sections of this Objection, not only is there a clear and legitimate bankruptcy purpose for the involuntary filing, bankruptcy proceedings are necessary to protect the interests of all creditors of this estate, not just the parties to the Foreclosure Action. Only in bankruptcy will a chapter 7 trustee be appointed with the powers to investigate, and potentially prosecute, actions that may be avoidable, voidable or unenforceable against the Debtor. Furthermore, the Petitioning Creditors obtain no litigation or other advantage by having the Debtor's financial problems addressed by this Court. The Debtor's claim is absurd, as, in a bankruptcy case, all parties participate on the level playing field created by the Bankruptcy Code.

64. Abstention will benefit nobody but the Debtor's controlling shareholder, Sharif. Under these circumstances, both the Debtor, its assets, and all creditors will be better served by the entry of an order for relief in this case and the appointment of a chapter 7 trustee.

## **CONCLUSION**

WHEREFORE, based on the foregoing, the Petitioning Creditors respectfully request this

Court (i) enter an order denying the relief requested in the Motion, (ii) enter an order for relief

with respect to the Involuntary Petition in this case, and (iii) grant such other and further relief as

is just and proper.

Dated:  September 9, 2021
       Wilmington, DE

**VENABLE LLP**

*/s/ Daniel A. O'Brien*
Daniel A. O'Brien (No. 4897)
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Tel: 302.298.3535
Fax: 302.298.3550
daobrien@venable.com

      and

Jeffrey S. Sabin, Esq.
Gary L. Rubin, Esq.
James E. Frankel, Esq.
Carol A. Weiner, Esq.
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Tel: (212) 307-5500
Fax: (212) 307-5598
jssabin@venable.com
glrubin@venable.com
jefrankel@venable.com
cweinerlevy@venable.com

*Attorneys for the Petitioning Creditors*