## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| PARK PLACE DEVELOPMENT | ) | Case No. 21-10849 (CSS) |
| PRIMARY, LLC., | ) | |
| | ) | |
| Alleged Debtor. | ) | |
| _____ | ) | |

### OPINION[1]

TROUTMAN PEPPER HAMILTON
SANDERS LLP
Marcy J. Mclaughlin Smith
Hercules Plaza, Suite 510
1313 N. Market Street
Wilmington, DE  19801
     -and-
Gary W. Marsh
600 Peachtree Street, NE
Suite 300
Atlanta, GA  30308
     -and-
Brett D. Goodman
875 Third Avenue
New York, NY  10022

Counsel to Park Place Development
Primary, LLC

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
     -and-
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP

VENABLE LLP
Daniel A. O'Brien
1201 North Market Street
Suite 1400
Wilmington, DE  19801
     -and-
Jeffrey S. Sabin
James E. Frankel
Gary L. Rubin
Carol A. Weiner
1270 Avenue of the Americas
24th Floor
New York, New York 10020

Counsel for the Petitioning
Creditors

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

Gary L. Kaplan
Matthew D. Parrott
Andrew M. Minear
One New York Plaza
New York, NY 10004

Counsel for Malayan Banking Berhad,
New York Branch, as Administrative Agent
For Malayan Banking Berhad, London Branch
Intesa Sanpaolo S.P.A., New York Brank, Warba
Bank K.S.C.P., and 45 Park Place Investments, LLC

Dated: November 2, 2021

Sontchi, J._____

## I.      __INTRODUCTION__ [2]

The two motions before me are the Alleged Debtor's *Motion for Dismissal of, or Abstention from, the Involuntary Chapter 7 Petition*,[3] and the Lenders' *Motion for Dismissal of the Involuntary Chapter 7 Petition or, in the Alternative, Relief from the Automatic Stay*.[4]

The main issues presented are whether: (1) the Involuntary Petition was filed in bad faith or for an improper purpose; (2) the Petitioning Creditors are qualified pursuant to 11 U.S.C. § 303(b) to commence this involuntary case; (3) I should abstain from or dismiss this case pursuant to 11 U.S.C. § 305(a); and (4) to grant the Lenders motion for relief from the automatic stay in the event I do not abstain from or dismiss this case.

---

[2] Terms used but not defined herein shall have the meaning ascribed to them *infra*.

[3] D.I. 31.

[4] D.I. 35.

These issues have been fully briefed and oral argument was held on October 1, 2021. I will dismiss the Involuntary Petition with prejudice as it was filed in bad faith. Accordingly, the remaining issues are moot.

## II.    JURISDICTION AND VENUE

I have subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before the United States Bankruptcy Court for the District of Delaware, pursuant to §§ 1408 and 1409. This is a core proceeding, pursuant to § 157(b), and I have the Constitutional authority to enter final orders.[5]

## III.    STATEMENT OF FACTS
### A.  General Background

The Alleged Debtor is a Delaware limited liability company that owns a single asset – a partially completed forty-three story residential building in New York City (the "Project").[6]  The goal for constructing the Project is to have fifty residential condominium units, along with nineteen storage units and 1, 129 square feet of retail condominium units. Additionally, the Project's developer, Sharif El-Gamar, has sought to build an Islamic Cultural Center on a connecting parcel of property.[7]

In order to finance the Project, on April 26, 2016, the Alleged Debtor entered into a *Building Facility Agreement* (the "BFA") and a *Project Facility Agreement* (the "PFA") with Malayan Banking Berhad, New York Branch, as administrative agent for Malayan

---

[5] The Alleged Debtor consents to the entry of final orders or judgments with respect to this Motion in the event it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments.

[6] D.I. 32, El-Gamal Decl., ¶¶ 4-5.

[7] D.I. 66, Ex. A. The Project is situated on New York County tax map as Block 126, Lot 8 and the Islamic Cultural Center was set to be built on New York County tax map Block 126, Lot 9.

Banking Berhad, London Branch, Intesa Sanpaolo S.P.A., New York Branch, WARBA Bank K.S.C.P. and 45 Park Place Investments, LLC (the "Lenders"), pursuant to which the Alleged Debtor obtained financing in the amount of USD $174 million.[8] Both the BFA and PFA (the "Facility Documents") were evidenced by Notes and secured by a recorded Mortgage.[9] The Facility Documents were intended to be compliant with principles of Sharia law which, among other things, prohibits interest payments.[10]

Pursuant to the terms of the BFA, "all … sums due and payable under the Notes and other Facility Documents, shall be paid in full [by the Termination Date]."[11] The Termination Date was April 26, 2019.[12] The sums due were not paid on the Termination Date.[13] Upon the occurrence of an "Event of Default" under the Facility Documents, the Mortgage permits the Lenders to institute a proceeding for the "foreclose[ure] [of] this Mortgage …."[14] As of June 1, 2021, according to the Lenders, the Alleged Debtor's outstanding balance is USD $130,856,015.18.[15]

Also, in furtherance of the Project, the Alleged Debtor entered into a *Construction Management Agreement* (the "CMA") with Gilbane Residential Construction, LLC

---

[8] D.I. 38, Parrott Decl., ¶ 4. The Alleged Debtor borrowed USD $162,112,896.16 under the BFA and USD $11,887,103.84 under the PFA.

[9] *See* D.I. 66, Ex. A.

[10] D.I. 74, Ex. V.

[11] D.I. 66, Ex. F, § 5.3(a).

[12] D.I. 38, Parrott Decl., ¶ 4; *see also id*. Ex. G.

[13] D.I. 35, ¶ 15.

[14] D.I. 38, Ex. C, § 2.1.

[15] D.I. 35, ¶ 13.

("Gilbane").[16] Gilbane was hired as the general contractor and agreed to, among other things, provide construction management services, including hiring various construction trades to work on the Project.[17]

In turn, Gilbane entered into agreements with various sub-contractors, including Permasteelisa North American Corp. ("PNA"), Construction Realty Safety Group, Inc. ("CR Safety"), Trade Off Plus, LLC ("Trade Off"), and S&E Bridge & Scaffold, LLC ("S&E").[18] Also, Soho Properties, Inc. ("Soho"), an alleged affiliate and authorized agent of the Alleged Debtor, entered into an agreement with Ismael Leyva Architect, P.C. ("ILA") on October 18, 2013, to provide architectural services for the Project.[19] I will refer to these entities as the "Petitioning Creditors."[20]

As of December 6, 2019, each of the Petitioning Creditors (aside from ILA) were notified via a letter delivered by e-mail that the CMA had been terminated for

---

[16] D.I. 66, Ex. D.

[17] D.I. 32, Gamal Decl., ¶ 18.

[18] PNA and Gilbane entered into their Trade Contract Agreement ("TCA") on September 30, 2016, where PNA was to furnish labor, services, materials and equipment for the design, manufacture, and installation of a curtainwall system, *see* D.I. 1, Ex. 1, Gannon Decl., ¶ 7. CR Safety and Gilbane entered into their Contract on December 21, 2017, where CR Safety was to furnish site safety management consulting services, *id*. Ex. 2, Caruso Decl., ¶ 7. Trade Off and Gilbane entered into their Contract on November 15, 2018, where Trade Off undertook finishing general construction labor services, *id*. Ex. 3, Caruso Decl., ¶ 7. S&E and Gilbane entered into their TCA on July 6, 2016, where S&E was to furnish labor, services, materials and equipment for the installation and dismantling of a hoist, heavy duty platform, roof protection shed, gate, fence, overhead protector, scaffold, start tower and other necessary items for work at the Project, *id*. Ex 5, Garcia Decl., ¶ 7.

[19] D.I. 1, Leyva Decl., ¶ 6.

[20] D.I. 65, ¶¶ 47(a)-(c); ¶ 54. In the Petitioning Creditors' Objection to the Alleged Debtor's *Motion to Dismiss*, they argue that at least three of the Creditors have direct unsecured recourse claims that are not contingent nor subject to a *bona fide* dispute – ILA, PNA, and S&E. As for CR Safety and Trade Off, the Objection argues that both mechanic's lienors are eligible to be petitioning creditors since they are not the sole petitioning creditors.

convenience and were asked to provide final invoices to Gilbane for services and materials provided under the Agreements.[21] The letter directed all of the trade contractors (including all Petitioning Creditors aside from ILA)[22] to "stop all work and place no further orders or subcontracts for materials, services, equipment or supplies, and otherwise incur no further liabilities."[23] It was represented that the Alleged Debtor may elect to assume certain subcontracts after the termination of the CMA.[24]

On December 24, 2019, PNA sent a Letter (the "Letter") to Gilbane terminating its subcontract for cause, i.e., Gilbane's alleged failure to make timely payments in accordance with the TCA between itself and PNA.[25] Specifically, PNA expressed that there had been "no cure via payment or otherwise of the breach of our contract for non-payment …. [Gilbane's] attempt to further delay payment or extend the cure period by invoking a "termination for convenience" during such cure period is, we are advised and believe, a legally unsupportable contrivance."[26]

In response, the Alleged Debtor sent an email to Gilbane for the purpose of "protect[ing] the fabricated panels and other materials … stored at PNA's facility and to

---

[21] D.I. 66, Ex. P.

[22] According to ILA's principal, around December 2019, Soho and the Alleged Debtor had fallen eight months behind on payment of the sums due for the services ILA had provided for the Project, causing ILA to cease performance of any further services related to the Project. *See* D.I. 1, Leyva Decl., ¶ 9.

[23] D.I. 1, Gannon Decl., ¶ 10; *see also* D.I. 66, Ex. P.

[24] D.I. 66, Ex. P.

[25] D.I. 66, Ex. R.

[26] *Id.*

minimize [the Alleged Debtor's] costs...."[27] In particular, the Alleged Debtor directed Gilbane to "immediately secure [the fabricated panels and materials] being stored at PNA's facility and [to] move [same] to a storage facility to be selected by the [Alleged Debtor], at its cost."[28]    To date, PNA contends that it has and still is storing the aforementioned materials and continues to incur substantial unpaid costs for storage.[29]

As for the other Petitioning Creditors, each provided either an accounting or a final invoice to Gilbane and/or the Alleged Debtor for the services and/or materials rendered in furtherance of the Project.[30]

Currently, the Project is not fully complete and is generating no income. According to the Alleged Debtor, as of 2019, the Project was worth USD $269 million "as is" and approximately USD $400.3 million in its completed state.[31] The Lenders obtained an appraisal in 2021, which valued the Project as being worth USD $87.9 million.[32]

The Alleged Debtor purportedly owes the Lenders USD $130,856,015.18.[33] Thus, based on the asserted values of the Project, the Alleged Debtor argues that the Lenders are over-secured, and the Lenders argue that they are under-secured.[34]

---

[27] *Id*. Ex. S.

[28] *Id.*

[29] D.I. 1, Gannon Decl., ¶ 11.

[30] D.I. 65, ¶ 40.

[31] D.I. 31, ¶ 10.

[32] D.I. 35, ¶ 11.

[33] *Id*. ¶ 13.

[34] *Id*. ¶¶ 56-57. The Lenders request relief from the automatic stay should I decide not to abstain from or dismiss this case. The Lenders argue that the Alleged Debtor's balance under the Facility Documents is

### B. **The New York Foreclosure Action**

When the Alleged Debtor did not repay the amounts alleged to be due and owing under the Facility Documents on the Termination Date,[35] a "Notice of Event of Default"[36] was sent by Malayan Banking Berhad, New York Branch, (the "Administrative Agent"), demanding immediate payment of the outstanding amount.[37]

The Alleged Debtor did not cure its default(s), so, on March 11, 2020, the Administrative Agent initiated a mortgage foreclosure action in the Supreme Court of New York (the "Foreclosure Action") against the Alleged Debtor. All Petitioning Creditors are parties to the Foreclosure Action and have filed answers, crossclaims, and counterclaims in connection therewith.[38]

On March 13, 2020, the New York court granted the Lenders' *Motion for an Ex Parte Order Appointing a Temporary Receiver*, finding that the appointment of a Receiver was

---

USD $130,856.015.18, which does not include protective advances and costs the Lenders have been paying in connection with the Foreclosure Action. Because the Lenders value the Project as being worth less than the Alleged Debtor's loan balance, the Lenders assert that the Alleged Debtor does not have an equity cushion to protect the Lenders' interests.

[35] According to the Alleged Debtor, the Mortgage Lenders failed to fund the Project as required under the BFA. On June 9, 2020, in the Supreme Court of New York, the Alleged Debtor filed a Complaint against the Mortgage Lenders alleging various causes of action for fraud, breach of contract, tortious interference with contract, business relations, and prospective economic advantage, along with a claim for civil conspiracy. *See* D.I. 31, ¶ 26.

[36] Pursuant to the terms of the mortgages, failure to pay the entire debt on the maturity date constitutes an "Event of Default" as defined therein. *See* D.I. 66, Ex. C, § 21(a).

[37] According to the Notice of Default, sent on April 29, 2019, the outstanding amount was USD $108,391,832. D.I. 38, Parrott Decl., Ex. G. As of June 1, 2021, the loan balance is USD $130,856,015. *See* D.I. 36, Abdullah Decl., ¶ 5.

[38] D.I. 38, Exs. J-M.

"necessary to ensure the mortgaged property and collateral is not lost or materially injured."[39]

To preserve the Project, the Lenders have made protective advance payments of USD $1,076.863.05 and estimate that the advances required to preserve the Project over the next six months will equate to USD $689,359,81.[40] These protective advances have been used to pay for insurance premiums, security, and taxes to the New York City taxing authorities.[41]

On January 22, 2021, the Lenders filed a *Motion for Summary Judgment* (the "Motion")  in the Foreclosure Action against various parties, including the Alleged Debtor and the Petitioning Creditors.[42] In that Motion, among other things, the Lenders argue that summary judgment in their favor is appropriate, i.e., the right to foreclose on their mortgage, given the Alleged Debtor's default under the Facility Documents.[43] Issues regarding priority of liens, including the Petitioning Creditors' mechanic's liens, were addressed in the Motion.[44]

---

[39] *Id.* Ex. I.

[40] D.I. 35, ¶ 34.

[41] *Id.* ¶ 21.

[42] D.I. 38, Ex N.

[43] *Id.*

[44] D.I. 35, ¶ 39.

The parties stipulated to a proposed briefing schedule with respect to the Lenders' Motion.[45] The fixed deadline for the Alleged Debtor and the Petitioning Creditors to respond was set for May 26, 2021.

### C.  The Involuntary Petition and Arguments Regarding its Dismissal

On May 24, 2021, two days prior to the Petitioning Creditors' deadline to respond to the Lenders' Motion, the Petitioning Creditors instituted this Chapter 7 action by filing an Involuntary Petition against the Alleged Debtor.[46] The Petitioning Creditors assert, among other things, Mechanic's Liens and Third-Party Beneficiary Claims under the BFA.[47] According to the Alleged Debtor, the Petitioning Creditors are not qualified to file an involuntary petition under 11 U.S.C. § 303(b).[48]

The Petitioning Creditors assert that at least three of them have claims that satisfy the requirements of 11 U.S.C. § 303(b). More specifically, ILA asserts that it has a direct, unsecured recourse claim against the Alleged Debtor for architectural services in connection with the Project in an amount "not less than $93,571.40," and represents that it has "waived its security interest in $16,750 of its unpaid claim, leaving it with an undisputed, unsecured recourse claim … in excess of the statutory threshold amount."[49]

---

[45] D.I. 38, Ex. O.

[46] D.I. 1.

[47] *See generally* D.I. 1.

[48] Federal Rule of Bankruptcy Procedure 1011 permits the debtor named in an involuntary petition to contest the petition.

[49] D.I. 65, ¶ 47(a).

PNA asserts that it has a direct, unsecured recourse claim against the Alleged Debtor for curtainwall storage costs incurred after the termination of its TCA with Gilbane, which is not included in its mechanic's lien.[50] According to PNA, it has continued to store the curtainwall and has incurred monthly storage costs for same in an "amount not less than $171,000.00 for which it has not filed a mechanic's lien."[51]

S&E asserts that it has a direct, unsecured recourse claim against the Alleged Debtor for hoist materials that it continues to provide in connection with the Project in "an amount not less than $143,000.00 for which [it] has not filed a mechanic's lien."[52]

In addition to the foregoing claims, the Petitioning Creditors argue that they have recourse claims against the Alleged Debtor as third-party beneficiaries under the BFA. Specifically, the Petitioning Creditors allege that §§ 13.1(e) and 13.1(ee) of the BFA give them third-party beneficiary rights because § 13.1(e) of the BFA requires the Alleged Debtor to discharge mechanic's liens by paying same or posting a bond in accordance with New York Lien Law.[53]

---

[50] Id. ¶ 47(b).

[51] Id.

[52] Id. ¶ 47(c).

[53] D.I. 66, Ex. F, § 13.1(e). The BFA provides, in pertinent part, "[o]bligor will, if any mechanic's lien claim is filed … discharge same, by either payment or the posting of a bond in accordance with Lien Law Section 19(4), or cause Title Company to provide affirmative takaful/insurance against within ten (10) days after receipt of notice of the filing of any claims …."

Additionally, the Petitioning Creditors argue that § 13.1(ee) requires the Alleged Debtor to place proceeds of Transactions (as defined in the BFA)[54] into a trust fund to be applied to the Costs of Improvement (as defined in the BFA)[55]. Also, they argue that § 8.2 of the BFA requires use of loan proceeds to pay certain items, which includes subcontractor's claims.

Aside from arguments pertaining to standing, and of most import with respect to this opinion, the Alleged Debtor as well as the Lenders argue that this Involuntary Petition was filed in bad faith and as a litigation tactic on the eve of their deadline to respond to the Lenders' Motion. It is the Alleged Debtor and Lenders' position that the Petitioning Creditors are simply unhappy with the pace of the Foreclosure Action and have filed the Involuntary Petition as a way to expedite a resolution with respect to issues regarding the Project. Interestingly, the Lenders argue that, if they are successful in the Foreclosure Action, the mechanic's lienors' liens will be extinguished as a result of the relative priorities of the Lenders' liens, the mechanic's liens, and the value of the Project.[56]

Moreover, the Alleged Debtor and Lenders both argue that no valid bankruptcy purpose is served by the filing of this Petition since the Alleged Debtor only has a single

---

[54] *Id*. § 2.1. The BFA defines "Transaction" as "each purchase of Metals by Administrative Agent at the request of Obligor and the subsequent sale of said Metals by Administrative Agent to Obligor."

[55] *Id*. The BFA defines "Costs of Improvement" as "such term is defined in Paragraph 5 of Section 2 of Article 1 of the Lien Law," which defines "Costs of Improvement" as, in pertinent part, "expenditures incurred by the owner in paying the claims of a contractor, an architect, engineer or surveyor, a subcontractor, laborer and materialman, arising out of the improvement …." N.Y. Lien Law, Art. 1, § 2, ¶ 5.

[56] D.I. 35, ¶ 3.

asset, and because a Receiver has already been appointed in the Foreclosure Action to preserve and protect the Project. The parties similarly submit that apprising me of what has already been litigated and addressed in the Foreclosure Action is wasteful of both the parties' and my resources.

It is the Petitioning Creditors' position that this Involuntary Petition was filed in good faith. They submit that their purpose in filing the Petition was to "preserve[] the Debtor's assets … [by] providing an opportunity to market and sell the stalled Project in an expeditious manner, free and clear of the lien disputes plaguing the Project, and giving a chapter 7 trustee the opportunity to investigate, and/or prosecute claims arising from … misrepresentations made by the Debtor …."[57]

Lastly, the Alleged Debtor and Lenders both argue that this Court should abstain from entering an order for relief pursuant to 11 U.S.C. § 305 because, among other things, the Involuntary Petition serves no valid bankruptcy purpose, was filed in bad faith, and because "[t]here is another forum already available to protect the interests of the Petitioning Creditors and Alleged Debtor as a result of the already pending Foreclosure Action."[58]

In their Objection, the Petitioning Creditors argue that the best interests of the Alleged Debtor and all creditors would be better served in bankruptcy rather than the Foreclosure Action because there is "no judicial economy to be served by relying on the

---

[57] D.I. 65, ¶ 56.

[58] D.I. 31, ¶¶ 66-68.

Foreclosure Action,"[59] when the Foreclosure Action is stalled, discovery has not yet been taken, and briefing of pending dispositive motions has not been completed.

In sum, the Petitioning Creditors assert that they have standing and are qualified to file an Involuntary Petition under § 303(b), that the Involuntary Petition was filed in good faith for the purpose of preserving and protecting the value of the Project for the benefit of all creditors, and that I should enter an order for relief permitting the Involuntary Petition to proceed.

## IV.   LEGAL DISCUSSION

### A. Standard

The Third Circuit has held that "bad faith provides an independent basis for dismissing an involuntary petition."[60] This is true even when petitioning creditors meet the statutory requirements of § 303(b),[61] and when the debtor is not paying its debts as they become due.[62] Because of the serious ramifications that stem from the filing of an involuntary petition, and because bankruptcy courts are courts of equity, they "are equipped with the doctrine of good faith so that they can patrol the border between good- and bad-faith filings."[63] "At its most fundamental level, the good faith requirement

---

[59] D.I. 65, ¶ 62.

[60] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 330 (3d Cir. 2015).

[61] *Id.* at 332; *see infra* pgs. 16-22.

[62] *Id.* at 333-334; *see* 11 U.S.C. § 303(h)(1).

[63] *Id.* at 334 (citing *In re SGL Carbon*, 200 F.3d 154, 161 (3d Cir. 1999)).

ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purpose of bankruptcy."[64]

Creditors enjoy the presumption of good faith, so it is the debtor's burden to show, by a preponderance of the evidence, that creditors have acted in bad faith sufficient to warrant dismissal of an involuntary petition.[65] The Third Circuit has adopted the "totality of the circumstances" standard for determining bad faith under § 303.[66] In adopting the standard, the *Forever Green* Court held that courts may consider a number of factors when making a determination as to whether an involuntary petition was filed in bad faith, including, but not limited to:

> Whether the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.[67]

---

[64] *In re Luxeyard, Inc.*, 556 B.R. 627, 640 (Bankr. D. Del. 2016) (citing *Forever Green*, 804 F.3d at 336) (internal citations omitted).

[65] *Forever Green*, 804 F.3d at 335 (citing *In re Petralex Stainless Ltd.*, 78 B.R. 738, 743 (Bankr. E.D.Pa. 1987)) (finding that the alleged debtor failed to meet its burden of establishing that a creditor acted in bad faith in filing an involuntary petition).

[66] *Id*. at 336.

[67] *Id*.

No one factor here is controlling. "The challenge, therefore, is to look at the totality of the circumstances," and determine whether the alleged debtor has met its burden by showing a finding of bad faith by a preponderance of the evidence.[68]

## B. <u>Analysis</u>

I find that that the Involuntary Petition was filed in bad faith and should be dismissed with prejudice.[69] In coming to this conclusion, I considered the pertinent *Forever Green* factors. Certain of these factors weigh against a finding of bad faith, while others are neutral or weigh in favor of a finding of bad faith. In consideration of all the factors, the Alleged Debtor has met its evidentiary burden in showing that the Involuntary Petition was filed in bad faith.

### 1. **Statutory Criteria**

This first factor – whether the Petitioning Creditors have met the statutory § 303(b) criteria[70] to file this Involuntary Petition – is at the center of this dispute. Indeed, the

---

[68] *In re Diamondhead Casino Corp.* 2016 WL 3284676 at *17 (Bankr. D. Del. June 7, 2016).

[69] 11 U.S.C. § 349 provides, in pertinent part, that "[u]nless the court, for cause, orders otherwise, the dismissal of a case ... under this title [does not] prejudice the debtor with regard to the filing of a subsequent petition ...." That being said, it is well-settled that bad faith is cause for dismissal with prejudice. *See In re Leavitt*, 171 F.3d 1219 (9th Cir. 1999) (finding that § 349 permits courts to dismiss a case with prejudice for bad faith filing in chapter 13 action); *see also In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 304 (Bankr. D. Del. 2011)(dismissing chapter 11 case with prejudice upon finding of bad faith); *In re Franco*, No. 2:15-BK-12214-WB, 2016 WL 3227154 at *6 (B.A.P. 9th Cir. June 2, 2016) (finding that, although *Leavitt* involved a chapter 13, the same standard for finding of bad faith in a chapter 7 should apply and dismissing chapter 7 case with prejudice).

[70] 11 U.S.C. 303(b) states, in relevant part,

   [a]n involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title –

   by three or more entities, each of which is either a holder of a claim against *such person* that is not contingent as to liability or the subject of a *bona fide* dispute as to liability or amount ... if such noncontingent, undisputed claims aggregate at least $16,750 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims ....

Alleged Debtor dedicates most of its Motion to this issue, and it was thoroughly discussed at oral argument.[71] For the reasons discussed herein, I find that the Petitioning Creditors fail to satisfy § 303(b) and, thus, this factor weighs in favor of a finding of bad faith.

### i.    Fully Secured, Non-Recourse Claims

As a threshold matter, I find that holders of solely non-recourse mechanic's liens fail to meet the statutory criteria set forth in § 303(b). Although the Petitioning Creditors argue that I should follow *Matter of East-West Associates*[72] for the proposition that fully secured, non-recourse creditors may be the sole eligible petitioning creditors under § 303(b), I decline to do so.

In *In re Taberna Preferred Funding IV, Ltd.*,[73] the Court explained that "[n]o other court in this Circuit has cited the *East-West Associates* decision"[74] for the same proposition the Petitioning Creditors urge here. Specifically, the Petitioning Creditors argue that claims against property (such as mechanic's liens) may constitute claims against "such person" as that phrase is used in § 303(b). In rejecting an identical argument, the *Taberna* Court explained that *East-West Associates* interchangeably used the terms "against the debtor" and "against such person" without explanation, even though the word "debtor" is not

---

[71] D.I. 105, 10/1/2021 Hearing Transcript at 27:3-28-11; 52:1-54:25; 69:11-72:24.

[72] 106 B.R. 767 (S.D.N.Y. 1989).

[73] 594 B.R. 576 (Bankr. S.D.N.Y. 2018).

[74] *Id.* at 596.

used in § 303(b).[75]  Instead, *Taberna* held that the phrase "claim against such person" does not include claims against a person's property.[76] Thus, the Court ultimately concluded that "because the [p]etitioning [c]reditors hold claims against only the [c]ollateral, and do not hold claims against taberna, they fail to meet the requirement under section 303(b)…."[77]

For the reasons set forth above, I find that solely holding a mechanic's lien, i.e., a fully secured, non-recourse claim, does not satisfy the statutory criteria of § 303(b).

### ii.    Third-Party Beneficiary Claims

Next, with respect to the Petitioning Creditors' arguments that they hold direct, unsecured recourse claims as third-party beneficiaries under the BFA, I find that this issue is the subject of a *bona fide* dispute such that it cannot satisfy § 303(b).[78] More specifically, the Petitioning Creditors argue that they are third-party beneficiaries under the BFA while, at the same time, disputing the validity and enforceability of the BFA.[79] While this argument is circular, it evidences the existence of a *bona fide* dispute as to the validity and enforceability of the BFA and its terms. Also, and independently, the Alleged

---

[75] 11 U.S.C. § 102(2) defines "claim against the debtor" to include "claim[s] against property of the debtor." Because the *East-West Associates* Court interchangeably used the words "debtor" and "person," it concluded that claims against a debtor included claims against the debtor's property, and, thus, that the petitioning creditors, who were mechanics' lienholders, were eligible creditors under § 303(b), despite solely holding secured, non-recourse claims.

[76] *Taberna*, 594 B.R. at 595.

[77] *Id*. at 597.

[78] A *bona fide* dispute exits "if there is an objective basis for either a factual or legal dispute …." *In re Sims*, 994 F.2d 210, 29 C.B.C.2d 443 (5th Cir. 1993), *cert. denied*, 510 U.S. 1049, 114 S. Ct. 702, 126 L. Ed. 2d 669 (1994).

[79] D.I. 65, ¶ 22 ("[E]xecution of the BFA by the Debtor appears to violate the Debtor's organizational documents and may, therefore, be void under Delaware law as an *ultra vires* act.").

Debtor disputes that the Petitioning Creditors are third-party beneficiaries under the BFA.[80]

### iii.    Additional Claims

Lastly, I find that the Petitioning Creditors' other claims do not satisfy the criteria set forth in § 303(b).[81] First and foremost, although ILA alleges that it has waived a portion of its security interest in its mechanic's lien,[82] waiving a portion of a non-recourse claim for purposes of initiating an involuntary petition "simply diminishe[s]" the claim and does not replace it with an unsecured claim.[83] Accordingly, ILA's claim is limited to its fully secured, non-recourse mechanic's lien.

Other than PNA's Mechanic's Lien and Third-Party Beneficiary claims, PNA asserts a contractual claim against the Alleged Debtor based on the December 24, 2019 Letter.[84] Specifically, PNA argues that it is owed monies for costs associated with storing the

---

[80] D.I. 31, ¶ 42 ("[T]he BFA in its entirety … do[es] not expressly provide the Petitioning Creditors with any right of enforcement under the BFA nor do[es] [it] evidence an intent on the part of its signatories to grant the Petitioning Creditors such a right.").

[81] As for Trade Off and CR Safety, the Petitioning Creditors acknowledge that these creditors simply hold mechanic's liens but argue that, because they are not the sole petitioning creditors, they may join in commencing this Involuntary Petition. I have already found that solely holding a mechanic's lien does not satisfy § 303(b)'s criteria. While I acknowledge that *Paradise Hotel Corp v. Bank of Nova Scotia* allows a secured creditor to be a petitioning creditor as long as it is not the sole petitioning creditor, 842 F.2d 47, 49-50 (3d Cir. 1988), because I find that neither ILA, PNA nor S&E hold qualifying claims, CR Safety and Trade Off may not be petitioning creditors under the facts of this case.

[82] D.I. 65, ¶ 10 ("ILA has an undisputed, unsecured recourse claim … by virtue of … waiver of its security interest in a portion of its claim ….").

[83] *In re Allen-Main Assocs. Ltd. P'ship*, 218 B.R. 278, 280 (Bankr. D. Conn.), *aff'd sub nom. In re Allen-Main Assocs. Ltd. P'ship*, 223 B.R. 59 (B.A.P. 2d Cir. 1998) (finding that "[w]ithout personal liability, there can be no unsecured claim. To the extent that [the petitioning creditor] is undersecured or waives part of its secured claim against the alleged debtor, its secured claim is simply diminished rather than replaced by an unsecured claim.").

[84] *See* D.I. 66, Ex. S.

curtainwall for the Project after the Alleged Debtor instructed Gilbane to remove the curtainwall from PNA's facility at the Alleged Debtor's cost.

The Alleged Debtor disputes its liability on this claim because the "Gilbane Letter does not constitute a contract between the Alleged Debtor and PNA."[85] More specifically, the Alleged Debtor argues that it directed *Gilbane* to move the curtainwall and that the Letter did not contain any "directive or instructions for PNA and no agreement to pay the selected storage facility for storage costs at any definitive time."[86] To that end, the Alleged Debtor argues that PNA's contractual claim "against the Alleged Debtor is non-existent or, at the very least, highly disputed by the Alleged Debtor."[87]

I find that PNA's contractual claim is subject to a *bona fide* dispute because the Letter specifically states that the "[Alleged Debtor] directs Gilbane to take appropriate action to immediately secure the [curtainwall] being storage at PNA's facility and move [the curtainwall] to a storage facility to be selected by [Alleged Debtor], at its cost."[88] Accordingly, it appears to be that any claim PNA has for Gilbane's failure to remove the curtainwall from its facility is more appropriate against Gilbane. When there is a "genuine issue of material fact that bears upon the debtor's liability … then a *bona fide*

---

[85] D.I. 31, ¶ 53.

[86] *Id*. ¶ 54.

[87] *Id*. The Alleged Debtor also argues that the Letter never expressly provided for when the Alleged Debtor would reimburse Gilbane for incurred storage costs and, thus, any claim against the Alleged Debtor is contingent because it is "not presently due and payable."

[88] D.I. 66, Ex. S.

dispute exists."[89] Because I find a genuine issue of material fact as to the Alleged Debtor's contractual liability, PNA's contractual claim fails to satisfy § 303(b).[90]

S&E claims that it has a direct, unsecured recourse claim against the Alleged Debtor for "hoist materials that it continues to provide to the debtor in connection with the Project."[91] The Alleged Debtor disputes S&E's claim because S&E failed to assert this claim at the time the Involuntary Petition was filed, and because S&E's "right to recover on account of this claim is limited to its contract counterparty – Gilbane."[92]

Similar to the foregoing discussion with respect to PNA, I find that S&E's claim for costs associated with hoist materials is subject to a *bona fide* dispute. Specifically, the Alleged Debtor disputes liability on this claim because S&E had a contractual relationship with Gilbane, not the Alleged Debtor, and the Alleged Debtor did not request S&E to continue performance under its TCA with Gilbane. To that end, the Alleged Debtor also argues that S&E is the cause of its own damages by failing to collect its equipment from the Project (thus disputing the amount of S&E's claim). Since it seems as though S&E's claim may be against Gilbane, and because the existence of a *bona fide* dispute "as to the amount of the debt is sufficient to deny a creditor standing to bring an involuntary

---

[89] *Riverview Trenton R.R. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 945 (6th Cir. 2007).

[90] *See id.* ("In determining whether a claim is subject to a *bona fide* dispute, the bankruptcy court must not resolve any genuine issues of fact or law.").

[91] D.I. 65, ¶ 47(c).

[92] D.I. 71, ¶ 32.

petition,"[93] S&E's claim for costs associated with providing ongoing hoist materials fails to satisfy § 303(b).

Accordingly, because the statutory criteria set forth in § 303(b)(1) is not satisfied by any Petitioning Creditor, this factor weighs in favor of a finding of bad faith.[94]

## 2. The Involuntary Petition's Merit

I do not find that the Involuntary Petition was filed without merit, *per se*. It is certainly true that the Project is incomplete, generating no income, and the parties do not necessarily dispute the fact that the Petitioning Creditors are mechanic's lienholders that provided services for the Project and are, thus, entitled to payment, whatever that payment may be. It is also true that the Alleged Debtor has not been paying its debts as they become do and has not paid the Petitioning Creditors what they believe they are owed. Indeed, even the Lenders agree that the Petitioning Creditors are "no doubt owed significant sums by the Alleged Debtor …."[95]

---

[93] *Credit Union Liquidity Servs., LLC, v. Green Hills Dev. Co., LLC (In re Green Hills Dev. Co., LLC)*, 741 F.3d 651, 658 (5th Cir. 2014) (discussing how, pre-BAPCPA, a dispute as to the amount of a claim was not considered a basis to deny standing, but that Congress added the phrase "as to liability or amount" to § 303(b) such that cases now recognize that a *bona fide* dispute as to the amount of a debt is now sufficient to deny a creditor standing to bring an involuntary petition).

[94] Even if the Court were to assume, *arguendo*, that the Petitioning Creditors do satisfy § 303(b) (which they do not), in *Forever Green*, the Third Circuit discussed how "meeting the § 303(b)(1) criteria" is similar to "pleading a *prima facie* case," in that it is "just the first hurdle." *Forever Green*, 804 F.3d at 334. The Court held that, even "if the … requirements are satisfied, that doesn't mean the bankruptcy court can't dismiss the case. *Id*. Ultimately, the Court found that "Congress intended for bad faith to serve as a basis for … dismissal," *id*., and despite the petitioning creditors satisfying the § 303(b)(1) criteria, the bankruptcy court did not abuse its discretion in dismissing the involuntary petition upon its finding of bad faith.

[95] D.I. 35, ¶ 3.

That being said, it is also true that the Petitioning Creditors have been actively litigating their claims in the Foreclosure Action and have raised the same issues there as they do here. The Petitioning Creditors can and do dispute issues regarding, among other things, lien priority, in the Foreclosure Action and, thus, the filing of this Involuntary Petition was not necessary for that purpose. Also, the Petitioning Creditors' asserted motive in filing this Petition was to have a § 363 sale and sell the Project.[96] However, a sale of the Project is also entirely possible within the confines of the Foreclosure Action. Accordingly, this factor is neutral.

### 3. Inquiry Into Relevant Facts and Law

The Petitioning Creditors did make a reasonable inquiry into the relevant facts and law of this case. Counsel for the Petitioning Creditors was well prepared and well-versed with respect to the facts of this case at oral argument. Based on the submissions received and oral argument, it is evident that counsel for the Petitioning Creditors conducted their due diligence prior to the filing of this Involuntary Petition. This factor weighs against a finding of bad faith.

### 4. Evidence of Preferential Payments or Dissipation of Assets

There is no evidence of the Alleged Debtor making any preferential payments or dissipation of the Project. Indeed, the Alleged Debtor has a single asset, which is currently being preserved by a Court-appointed Receiver and is insured by protective advance payments made by the Lenders. This factor weighs in favor of a finding of bad faith.

---

[96] D.I. 65, ¶ 56 ("[T]he Involuntary Petition serves the quintessential bankruptcy purpose of … providing an opportunity to market and sell the stalled Project in an expeditious manner ….").

### 5. Ill Will or Harassment

The filing of the Involuntary Petition was done with ill will. Specifically, as has been mentioned on several occasions, the Petitioning Creditors filed this Petition two days prior to their court ordered answering deadline in the Foreclosure Action. Moreover, the Petitioning Creditors elected to waive the § 303(b) statutory amount from their secured Mechanic's Lien Claims in order to file the Petition. I can only assume that the Petitioning Creditors' motive in filing this Involuntary Petition was to halt the Foreclosure Action from proceeding, to receive an order for relief under Chapter 7, in hopes of litigating this dispute in what they believe to be a "friendlier forum"[97], and to sell the Project in accordance with § 363. This factor weighs in favor of a finding of bad faith.

### 6. Disproportionate/Tactical Advantage and Suspicious Timing

Clearly, the Involuntary Petition was filed to stay the Foreclosure Action (which the Petitioning Creditors have been actively litigating) so that the Petitioning Creditors did not have to file answers to the Lenders' pending *Motion for Summary Judgment*, despite having stipulated to a briefing schedule that was subsequently so ordered by the Foreclosure Action Court.[98]

Nonetheless, the Petitioning Creditors' subjective motive for doing so is somewhat unclear – the Foreclosure Action Court explained that dispositive motions would not be heard and/or decided until 2022 – accordingly, I can only conclude that the Petitioning Creditors are unhappy with the speed of the Foreclosure Action and filed the Involuntary

---

[97] D.I. 35, ¶ 38.

[98] D.I. 38, Ex. O.

Petition in this Court in hopes of expediting a resolution with respect to the Project. However, filing this Involuntary Petition to stall the completion of briefing on the Lenders' Motion and an eventual decision in the Foreclosure Action is an improper use of the bankruptcy process. [99]

Courts have previously held that involuntary petitions filed as litigation tactics are bad faith filings.[100]  For instance, in *Forever Green*, the Court dismissed the involuntary petition at issue, finding that the suspicious timing of its filing – days before a petitioning creditor's brief was due in a state action – was significant to its ruling. I find that the filing of the Involuntary Petition here had suspicious timing and that same was used to gain a tactical advantage in this ongoing dispute. These factors weigh in favor of a finding of bad faith.

Next, I find that the Involuntary Petition was filed in an attempt to reframe issues with respect to lien priority. Indeed, the Petitioning Creditors themselves state that one of their purposes in filing the Involuntary Petition is to "sell the stalled Project in an expeditious manner, free and clear of the lien disputes plaguing the Project…."[101] It is undisputed that the Lenders' Motion in New York State Court addresses issues regarding

---

[99] *In re CNG Foods, LLC*, 2020 WL 4219679 at *12 ((Bankr. E.D.N.Y. July 13, 2020)) (citing *In re Anmuth Holdings, LLC*, 600 B.R. 168, 192, (Bankr.D. E.D.N.Y. 2019)) ("The filing of an involuntary petition to circumvent an adverse decision in the state court, to preempt an impending state court decision, or to stay a decision in the state court from taking effect, constitutes evidence of bad faith.").

[100] *Anmuth Holdings,* 600 B.R.at 192 (awarding punitive damages for bad faith filing upon finding that same was filed for purposes of coercing a settlement).

[101] D.I. 65, ¶ 56.

the priority of liens[102], and, according to the Lenders, should they be successful, the Petitioning Creditors' liens will be extinguished due to their relative priorities and the value of the Project.[103] Accordingly, I find that the Involuntary Petition was filed to obtain a disproportionate advantage with respect to issues of lien priority and that this factor weighs in favor of a finding of bad faith.

### 7. Substitute for Debt Collection

As for whether this Involuntary Petition was used as a substitute for customary debt collection, to state the obvious, there is already a Foreclosure Action pending in New York State Court. The Lenders seek to foreclose on the Project while the Petitioning Creditors assert competing mechanic's liens. According to the Lenders, the mechanic's liens are subject to extinguishment and will likely not be paid should the Lenders prevail on their *Motion for Summary Judgment*. Thus, it is apparent that the Petitioning Creditors are using this Involuntary Petition as a substitute for the Foreclosure Action. Indeed, the Petitioning Creditors waived the § 303(b) statutory amount to have unsecured debt in addition to their mechanic's liens for purposes of qualification. This factor weighs in favor of a finding of bad faith.

---

[102] D.I. 38, Ex. N at pgs. 18-21; 24-26. The *Motion for Summary Judgment* specifically argues that the BFA is a "building loan contract" under New York Lien Law, that its requirements were fully satisfied, and that it is superior to the subsequently filed mechanic's liens under New York law.

[103] Moreover, I note that any arguments regarding relative lien priorities should be resolved in the Foreclosure Action for purposes of judicial economy given the fact that said issue has already been raised by the Lenders' *Motion for Summary Judgment* and thus should be addressed in the Petitioning Creditors' answers.

Moreover, no valid bankruptcy purpose is served by the filing of this Involuntary Petition. "To be filed in good faith, a petition … must seek to create or preserve some value that would otherwise be lost …."[104] Here, the filing of this Involuntary Petition neither creates nor preserves value that would otherwise be lost. As previously mentioned, a Receiver is currently preserving the Project with payments being made by the Lenders to keep the Project compliant with the New York taxing authorities and applicable insurance laws.

Thus, the balance of factors weigh in favor of finding the Involuntary Petition was filed in bad faith.

### V.    <u>CONCLUSION</u>

For the foregoing reasons, namely, because I find that the Involuntary Petition was filed as a litigation tactic and in bad faith, the Motions to Dismiss will be **GRANTED** and the Involuntary Petition will be **DISMISSED** with prejudice. An order will be entered.

---

[104] *In re Forever Green Athletic Fields, Inc.* 500 B.R. 413, 425 (Bankr. E.D.Pa. 2013).