**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | Case No. 21-10849 (CSS) |
| PARK PLACE DEVELOPMENT | : | |
| PRIMARY, LLC, | : | **Reply to Objection to Cross Motion** |
| | : | **Deadline:  February 14, 2022 at 4:00 p.m.** |
| | : | |
| | : | **Hearing Date:** |
| | : | **February 17, 2021 at 9:30 a.m.** |
| | | |
| Alleged Debtor. | : | **Re: Dkt. Nos. 90, 95 & 98** |

------------------------------------------------------------- x

**INVOLUNTARY PETITIONERS' OMNIBUS REPLY TO ALLEGED DEBTOR'S AND LENDERS' OBJECTIONS TO CROSS MOTION FOR RECONSIDERATION OF ORDER DISMISSING INVOLUNTARY PETITION FOR BAD FAITH**

Permasteelisa North America Corp. ("**PNA**"), Construction Realty Safety Group Inc. ("**CR Safety**"), Trade Off Plus, LLC ("**Trade Off**"), Domini Inspection Services, Inc. ("**Domini**"), S&E Bridge & Scaffold LLC ("**S&E**"), and Ismael Leyva Architect, P.C. ("**ILA**"), the petitioning creditors (collectively, the "**Petitioning Creditors**")[1] in the above-captioned closed involuntary chapter 7 bankruptcy case, by and through their attorneys, Venable LLP, respectfully submit this Reply to (i) *Objection Of Park Place Development Primary LLC To Involuntary Petitioners' Cross Motion, Pursuant to Bankruptcy Rule 9024, for Reconsideration of the Order Dismissing the Involuntary Petition for Bad Faith* [D.I. 98] (the "**PPDP Objection to Cross Motion**") and (ii) *Lenders' Objection To Petitioning Creditors' Cross Motion, Pursuant to Bankruptcy Rule 9024, for Reconsideration of the Order Dismissing the Involuntary*

---

[1] Pursuant to the *Notice of Withdrawal of Domani Inspection Services, Inc. As A Petitioning Creditor* [D.I. 60] and the supporting Declaration of Adam Eisen attached thereto, Domani withdrew as a petitioning creditor, but Domani appears to be included in the Motion to Reopen and the Fee Motion (as hereinafter defined).  As such, Domani is joining in the filing of this Objection and Cross Motion solely to the extent the Alleged Debtor is seeking to include it in the relief requested in the Motion to Reopen and the Fee Motion.

*Petition for Bad Faith* [D.I. 95] (the "**Lenders' Objection to Cross Motion**" and, together with

the PPDP Objection to Cross Motion, collectively, the "**Objections to Cross Motion**") and

respectfully state as follows:[2]

### <u>PRELIMINARY STATEMENT</u>

If there is one thing to which the parties in this case appear to agree, it is the fulsomeness

of the record.  Rather than belabor points in this Reply that have already been fully discussed in

previously filed pleadings, the Petitioning Creditors would like to highlight four points: (i) the

Dismissal Order and related Dismissal Opinion contain factual errors and/or misunderstandings

of, or evidence of a failure to consider, the stipulated facts of record in this case that are central

to the Court's applications of applicable law and conclusions, (ii) this Court recognized in the

*Energy Future* case that a fundamental misunderstanding of, or failure to consider, critical facts

in a complex case warrants reconsideration of a prior order, whether under Bankruptcy Rules

9023 or 9024, (iii) if this Court reopens the case to consider the Alleged Debtor's second 303(i)

motion despite the language of the Dismissal Order, then it is mandated to take appropriate steps

to ensure that the parties are not prejudiced by relying on the Dismissal Order, regardless of the

Lenders' contention to the contrary, and (iv) it is the Alleged Debtor's own gamesmanship,

indeed its waiver of its 303(i) rights in the face of the Dismissal Order (which neither granted the

Alleged Debtor fees nor retained jurisdiction), the Dismissal Opinion, and the closing of the case

that induced the Petitioning Creditors not to file a timely notice of appeal of the Dismissal Order.

Accordingly, the Court should either refuse to reopen the case to consider the Alleged Debtor's

---

[2] Pursuant to the *Involuntary Petitioners' (I) Objection to Alleged Debtor's Motion to Reopen Case, Or, In the Alternative, (II) Cross Motion, Pursuant to Bankruptcy Rule 9024, for Reconsideration of the Order Dismissing the Involuntary Petition for Bad Faith* [D.I. 90] (the "**Objection and Cross Motion**"), the Petitioning Creditors seek reconsideration of the Dismissal Order and Dismissal Opinion only in the event the Court decides to reopen the Alleged Debtor's case.  All capitalized terms not otherwise defined herein shall have the same meaning as is ascribed to such terms in the Objection and Cross Motion.

second request for fees and damages, or, if it chooses to reopen the case, it should reconsider the

Dismissal Order (and related Dismissal Opinion) and, if applicable, fashion a remedy that

preserves the Petitioning Creditors' rights to appeal the Dismissal Order and any "clarification"

of its Dismissal Opinion.

## ARGUMENT

### Manifest Errors of Fact

1.      There are factual errors or oversights in the Dismissal Order, including ILA's

ineligibility as a petitioning creditor and the lack of a showing of a dissipation of the Alleged

Debtor's assets.

2.      ILA had two claims: (i) a direct recourse *contract* claim based on the Soho/ILA

contract that the Alleged Debtor accepted and consented to, which claim became secured when

ILA timely filed a mechanic's lien against the Alleged Debtor's real property (a portion of which

security interest was waived, *see* Leyva Decl. [D.I. 67] at ¶ 5.), and (ii) a secured mechanic's lien

claim against the Alleged Debtor's property. Leyva Decl. [D.I. 1, Exh. 6] at ¶¶ 6, 7, 8 and 19.)

("[A]t the request of Soho on behalf and with the consent of Park Place Primary, ILA provided

the Services for the Project pursuant to the Contract"); Leyva Decl. [D.I. 67] at ¶ 6.)

("Accordingly, ILA has an undisputed, unsecured, recourse claim against the Debtor. . .").  In

determining that ILA was ineligible to be a petitioning creditor, this Court misunderstood that

ILA had a direct, recourse claim as well as a mechanic's lien and focused only on the mechanic's

lien.  The record simply does not support a legal conclusion that is based only on ILA's

mechanic's lien claim.  As such, the factual error was not only indisputable, it was critical to the

Court's conclusion that the Petitioning Creditors did not satisfy the legal criteria under Section

303(b) of the Bankruptcy Code.  *See* Dism. Op. at p.19, n.81 (acknowledging that a secured

creditor may be a petitioner under *Paradise Hotel* so long as it is not the only petitioner, but

finding that, because ILA, PNA nor S&E held qualifying claims, *Paradise Hotel* was not applicable). Accordingly, the Court's failure to consider ILA's contract claim was a manifest error of fact.[3]

3.      The record contained documentary evidence that, on its face, demonstrates Sharif's manipulation and dissipation of the Alleged Debtor's assets. The Development Letter and the Fried Frank Letter that were part of the record evidence that Sharif caused Development to secretly obligate the Alleged Debtor to pay Development $45 million in fees and then threatened to shut down the Project if the Lenders did not fund loans so that the fees could be paid. *See Objection of Petitioning Creditors to PPDP's Motion to Dismiss* [D.I. 65] ("**Obj. to PPDP Motion to Dismiss**") Exh. N; Tr. 90: 9-23 (10/1/2021). Similarly, the 2019 Zoning Certification evidenced Sharif's dissipation of the Project when he certified in October 2019 to the New York Department of Finance that Development, not the Alleged Debtor, owned Lot 8, the parcel of land on which the Project was being built. *See* Obj. to PPDP Motion to Dismiss Exh. O; Tr. 96: 8-14 (10/1/2021).[4]

4.      The Petitioning Creditors respectfully submit that the Court either overlooked or completely disregarded this relevant evidence, because if it had considered the evidence, it would have either found that the Petitioning Creditors had satisfied the "dissipation" factor, or, at a minimum, it would have expressly rejected the importance of such evidence, but it would not have been silent on the evidence proffered. Given the voluminous record, the presentations made

---

[3] Though Sharif has stated that the Alleged Debtor was not a party to the ILA contract, he has never disputed that Soho was the Alleged Debtor's agent under the ILA contract nor that PPDP made payments directly to ILA and, to date, has failed to respond to these same facts as alleged by ILA in its cross claims filed over a year ago in the Foreclosure Action. This failure to dispute the agency relationship and related facts and pleadings are part of the record and were brought to this Court's attention during the MTD Hearing. Tr. 59: 1-19 (10/1/21), Sharif Decl. at ¶¶ 19 and 29.

[4] At the MTD Hearing, the Petitioning Creditors also pointed out to the Court the discrepancy between the Alleged Debtor's Project Valuation ($269 million) and the Lenders' valuation (approx. $89 million), which also demonstrates continuing dissipation of the Project. Tr. 73: 21- 74: 5 (10/1/2021).

at the MTD Hearing, and the Court's silence in its Dismissal Opinion, it is obvious that the Court overlooked these facts, made a finding (that the Petitioning Creditors had failed to evidence any dissipation of assets) that was unsupported by the record, and constitutes manifest error.

**Misapplication of Law to Facts**

5.      The Petitioning Creditors do not dispute that they filed the Involuntary Petition two days prior to the deadline to respond the Lenders' summary judgment motion in the Foreclosure Action.  The Petitioning Creditors do dispute, however, that this fact alone is sufficient to support an inference and factfinding of bad faith under applicable law, and respectfully submit the Court failed to properly apply the law it cited in support of its decision on suspicious timing to the facts of this case.[5]

6.      Despite PPDP's position to the contrary, *see* PPDP Obj. to Cross Motion at ¶ 37, *Forever Green* does not set out a bright line rule that the filing of an involuntary petition shortly before the expiration of a briefing deadline in an underlying litigation constitutes, or even supports, bad faith.  *See, generally, In re Forever Green Athletic Fields, Inc.,* 804 F.3d 328, 330 (3d Cir. 2015). The timing of the filing cannot be viewed in a vacuum.  Rather, it is the specific circumstances and posture of the underlying action at the time the involuntary petition is filed that is important in determining whether the timing of a filing is "suspicious" and evidence of

---

[5] Whether the court misapplied the law to the facts is an appropriate inquiry under Rule 60(b)(1). *See, e.g., Irwin v. Miami-Dade Cty. Pub. Sch.*, 2008 WL 11333099, at *1 (S.D. Fla. June 24, 2008) (the misunderstanding or misapplication of law is properly asserted in a Rule 60(b)(1) motion); *In re Bryan Rd., LLC*, 389 B.R. 297, 300 (Bankr. S.D. Fla. 2008) (same); *In re Rijo*, 2012 WL 1309630, at *4 (Bankr. E.D.N.Y. Apr. 16, 2012) ("Arguments that the court misapplied or misconstrued the law… [is] properly made under Rule 60(b)(1)."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Virginia Cavins & Progressive Sys., Inc.*, 2007 WL 2692723, at *3 (M.D. Ala. Sept. 11, 2007) (misapplication of law within purview of Rule 60(b)(1)); *In re McFarland*, 2016 WL 882168, at *5 (Bankr. S.D. Ga. Mar. 7, 2016) (the purpose of a Rule 60(b)(1) motion is to correct manifest errors of law or misapplication or misunderstanding of facts), *aff'd*, 557 B.R. 256 (S.D. Ga. 2016); *but see Kling v. Garcia*, 2018 WL 3957049, at *1 (D. Kan. Aug. 17, 2018) ("A Rule 60(b) motion is not an opportunity for a party… to challenge the correctness of the district court's judgment by arguing that the district court misapplied the law or misunderstood their position."); *Home Casual Enter. Ltd. v. Home Casual LLC*, 2013 WL 4821311, at *2 (W.D. Wis. Sept. 10, 2013) (Rule 60(b) relief not permitted in cases of misapplication of law or legal error).

bad faith. In rendering its decision on bad faith in *Forever Green*, the Third Circuit noted, almost in passing, that the filing of the involuntary petition at issue had "suspicious timing" because it was filed "days before [the petitioning creditor's] responsive brief was due" in the underlying action. *Id.* at 337.[6] The Third Circuit cited no authority and provided no discussion or reasoning to support this proposition, nor was such timing the only fact of bad faith found by the Court. Rather, it appears that the timing in *Forever Green* was likely suspicious to the Court because of the egregious (and easily distinguishable) multiple acts of bad faith conduct by the petitioning creditors preceding the filing.[7] Certainly, the existence of the underlying litigation, briefing and attendant deadline at issue in *Forever Green* was the sole consequence of the petitioning creditors' own inequitable conduct and the alleged debtor's attempt to remedy it. *See, generally, id.* at 330 -332, 336, 337.[8] This a far cry from the circumstances of this case, as set forth below (and as reflected in the record of this case).

---

[6] The involuntary petition was in fact filed two weeks before the responsive brief was due. *Id.* at 331.

[7] *See fn.* 8, *infra.*

[8] In *Forever Green*, one of the three petitioning creditors, Charles Dawson ("**Charles**"), was a former sales representative of the debtor, Forever Green, and the owner of ProGreen, a competitor of Forever Green. *In re Forever Green Athletic Fields, Inc.,* 804 F.3d 328, 330 (3d Cir. 2015). Another petitioning creditor was Charles' wife, Kelli Dawson (together with Charles, the "**Dawsons**"). *In re Forever Green Athletic Fields, Inc.,* 500 B.R. 413, 416 (Bankr. E.D. Pa. 2013). Forever Green sued ProGreen for $5 million for the diversion of corporate assets (the "**Bucks County Action**"). *Forever Green*, 804 F.3d at 330. While that litigation progressed, the Dawsons filed a separate suit against Forever Green for unpaid wages (the "**Louisiana Action**"), which ended with entry of a consent judgment that totaled approximately $300,000. *Id.* at 330-331. While the Bucks County Action was still running its course, the parties agreed to arbitrate their claims. *Id.* at 331. However, in the weeks after the Dawsons obtained the consent judgment in the Louisiana Action, ProGreen (at the behest of Charles) filed a motion to terminate the arbitration proceeding. *Id.* "The next month, the Dawsons transferred their judgment in the Louisiana Action to Pennsylvania and obtained a writ of execution against the arbitrator and his law firm. At that point, with his fees in peril, the arbitrator recognized he was adverse to the Dawsons, so he suspended the arbitration until the fee issue was resolved." *Id.* In response to the suspension of the arbitration, Forever Green was forced to file a complaint in state court to try and reinstate the arbitration (the "**Philadelphia Action**"). *Id.* The judge in the Philadelphia Action issued a scheduling order for the parties to brief the issues identified in Forever Green's Philadelphia Action complaint. The Dawsons' brief was due on May 3, 2012. *Id.* Instead of filing their brief and litigating Forever Green's attempt to reinstate the arbitration, the Dawsons filed an involuntary petition against Forever Green on April 20, 2012. *Id.*

As articulated by the Third Circuit on appeal, "[light on] meritorious arguments, Dawson's plan was to use the consent judgment to garnish the arbitrator's fees, thereby forcing the arbitrator to halt the arbitration. Dawson… said

7.      Cases where the timing of the filing of the bankruptcy petition was deemed by the court to be evidence of bad faith, including those that cite *Forever Green* for the proposition, consistently involve a filer attempting to evade an imminent adverse decision, stay an adverse decision from taking effect, or threaten an involuntary bankruptcy in order to extract a settlement of a claim for the sole benefit of the filer.  Indeed, the two other cases cited by the Court in the Dismissal Opinion to support a finding of suspicious timing, *In re CNG Foods, LLC*, 2020 WL 4219679 (Bankr. E.D.N.Y. July 13, 2020) and *In re Anmuth Holdings, LLC*, 600 B.R. 168 (Bankr. E.D.N.Y. 2019), are idyllic examples of just such cases.  Dism. Op. at p. 25, n. 99.  No such facts exist in this case.

8.      In *Anmuth*, one of the petitioning creditors, Miller, initiated multiple state court actions against the alleged debtor (and others) in which he attempted to restrain the drawdown on certain standby letters of credit ("**SLOCs**") and restrain any disposition of certain cash collateral. *Anmuth Holdings*, 600 B.R. at 181.  Miller was ultimately unsuccessful in his attempt to obtain an injunction and the prior stay that had been granted with respect to the SLOCs was vacated by order of the court.  *Id.* at 181, 193.  "Upon his appeal of [that decision] and request for a stay, the state Appellate Court refused to enjoin the [drawdown of] the standby letters of credit or the transfer of the Cash Collateral."  *Id.* at 193.  The involuntary petitions were filed against the alleged debtor within hours of receiving that adverse decision in the appellate court to "stay the money being transferred from the bank[,]" as testified to by Sprei, a petitioning creditor.  *Id.*

---

[he] would keep the arbitration suspended until Forever Green paid on the consent judgment. [He] also threatened to file an involuntary petition unless Forever Green agreed to stop the proceedings.  Keeping his word, Dawson filed an involuntary petition after Forever Green tried to reinstate the arbitration." *Id.* at 336. And in doing so, "[h]e put his own interests above all others[,]" obstructed "Forever Green from pursing its largest asset [the claim against his company, ProGreen], the potential proceeds of which Forever Green could have used to pay its creditors[,]" and failed to engage "in the type of due diligence and sober decision making-making process that should precede any involuntary filing." *Id.* at 336-337.

9.      In *CNG*, three of the four petitioning creditors were involved in an underlying state court action brought by the alleged debtor, CNG Foods, LLC ("**CNG**"), which operated as a restaurant, to enjoin Fogel, the purported owner and manager of CNG, from accessing the premises or any of the alleged debtor's property. *CNG Foods*, 2020 WL 4219679 at *3. In response, Fogel sought to enjoin and restrain certain employees of CNG, including Zaitschek, Stern and Shteierman (the latter two petitioning creditors) from entering CNG's premises. *Id*. Ultimately, the court ordered (the "**Access Order**") such CNG employees to restore access to CNG's premises and property to Fogel, among other things. *Id.* After Zaitschek, Stern and Shteierman allegedly failed to comply with the Access Order, the court executed an order to show cause (the "**OTSC**") scheduling a contempt hearing (the "**Contempt Hearing**") to determine if any of the CNG employees were in contempt of the Access Order. *Id.* Thereafter, the action was dismissed with the OTSC and Contempt Hearing surviving dismissal. *Id.* One day prior to the Contempt Hearing, and the possibility of an imminent adverse decision, Stern and Shteierman (two of the CNG employees), along with two others, filed the involuntary petition against CNG. *Id.*

10.      Unlike in *CNG* and *Anmuth*, the record in this case is undisputed that there was no decision imminent in the Foreclosure Action on the Lenders' motion for summary judgment or otherwise, let alone an adverse decision. Rather, the New York Court advised the parties that they should not expect the court to address pending dispositive motions, including the pre-discovery motion for summary judgment filed by the Lenders, for at least a year after such motions were fully briefed and submitted to the court. Further, unlike in *Forever Green*, in which it is not known whether an adverse decision was imminent or not, the underlying litigation, briefing and attendant deadline in the Foreclosure Action were not the result of the

Petitioning Creditors' conduct, inequitable or otherwise.  Moreover, the egregious pre-filing conduct of the petitioning creditors in *Forever Green* is entirely absent here.

11.    The record is void of any pre-filing threats by the Petitioning Creditors of any kind, including threats to file an involuntary petition or to harm the Project or other creditors.  To the contrary, the record reflects that PNA continues to store the Alleged Debtor's curtainwall and S&E continues to keep its hoist at the Project and available to the Alleged Debtor.  *See, e.g.,* Garcia Decl. [D.I. 68] at ¶ 5; Gannon Decl. [D.I. 1] Ex. 1 at ¶ 25.  Further, "[putting their] own interests above all others," the petitioning creditors in *Forever Green* filed their involuntary petition to obstruct the alleged debtor from pursing its claim against their company (ProGreen), which constituted the alleged debtor's largest asset, the potential proceeds of which Forever Green could have used to pay its creditors.  *Forever Green,* 804 F.3d at 336-337.  And in so doing, they filed the involuntary petition hastily and without "the type of due diligence and sober decision making-making process that should precede any involuntary filing." *Id.* at 337.  The opposite is true here.  In fact, the filing was made after careful consideration, *see* Dism. Op. at p. 23, to preserve the value of the Alleged Debtors' property, not destroy it, and because the Petitioning Creditors believed that all creditors would benefit from the bankruptcy forum where an independent trustee could investigate and prosecute claims that are not available in the Foreclosure Action (*i.e.*, fraudulent conveyance, equitable subordination, and ultra vires).  *See, e.g.,* Obj. to PPDP Motion to Dismiss at pp. 4, 7-9; Tr. 51: 1-16 (10/1/2021).

12.    The Petitioning Creditors respectfully submit that the Court failed to properly apply the law it relied on with respect to suspicious timing (*i.e.*, *Forever Green*, *Anmuth* and *CNG*) to the facts and circumstances of this case.  Under the circumstances, the fact that the Involuntary Petition was filed a few days prior to the deadline to respond to the Lenders' motion

is of no consequence, and the record simply does not support a finding of suspicious timing or use of litigation tactics under applicable law.

**Additional Issues Raised By Lenders and Alleged Debtor**

13.     In the event this Court reopens the case, the Lenders assert that the Petitioning Creditors are not entitled to reinstatement of their appeal rights.  The Petitioning Creditors disagree.  First, the Third Circuit recognizes that courts have the power to reconsider their prior decisions (and the law of the case doctrine does not limit that power), so long as the court explains its reasons for reconsideration and "takes appropriate steps so that the parties are not prejudiced by reliance on the prior ruling."  *Energy Future Holdings Corp.*, 904 F.3d 298, 310-11 (3rd Cir. 2018) (quoting *William v. Runyon*, 130 F.3d 568, 573 (3rd Cir. 1997)).  Under the circumstances, permitting the Alleged Debtor to prosecute a second motion for fees after the Dismissal Order was entered, after the case was closed, and after the appeal period had run is tantamount to the Court reconsidering and substantively amending the Dismissal Order and "clarifying" or supplanting its Dismissal Opinion, in which case this Court is mandated to "take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling."  Either the Court should refrain from reopening the case and considering the Alleged Debtor's second request for fees and damages,[9] or it should fashion a remedy that preserves the Petitioning Creditors' rights to seek reconsideration and appeal of the Dismissal Order and related decision on which they relied, but it must do one or the other in order to fulfill its mandate.

---

[9] Contrary to the Lenders' contention in paragraph 4 of their Objection to Cross Motion, it is *not* the Petitioning Creditors that are seeking to delay the Foreclosure Action but the *Alleged Debtor* that, by seeking to reopen this case, is using litigation tactics to delay the Foreclosure Action.  Indeed, the Petitioning Creditors have agreed to a briefing schedule in the Foreclosure Action, filed their responsive motion papers to the Lenders' Motion for Summary Judgment, and have otherwise done nothing to delay the Lenders' efforts to move the Foreclosure Action forward. The Lenders' argument is simply disingenuous. Lenders' Obj. to Cross Motion at ¶ 4.

14.     Second, the Alleged Debtor's decision to remain silent until the Dismissal Order appeals period ran was, in hindsight, utter gamesmanship.  This Court entered an order that did not provide for costs and damages or for retention of jurisdiction and then closed the case, but the Alleged Debtor did nothing to ascertain whether or how it was going to assert its section 303(i) claims.  Not until after the appeals period ran and Venable sent the November 23rd letter to chambers did the Alleged Debtor start asking for clarification of the Dismissal Order.  By this time, the Petitioning Creditors' appeal rights had expired, and any change or "clarification" to the Dismissal Order would negatively and unfairly prejudice their rights.  The Alleged Debtor's behavior demonstrates the kind of unlawful gamesmanship that provides sufficient cause for this Court to protect the Petitioning Creditors' rights in having relied on the language of the Dismissal Order.  As a court of equity, there is no doubt that the Court has the power and authority to fashion appropriate equitable relief in this context.  *See, e.g., In re Millennium Lab Holdings, II, LLC,* 575 B.R. 252, 288 (Bankr. D. Del. 2017) (holding that to the extent the creditor intentionally kept its constitutional objection in its back pocket to be used on appeal if it was not successful in its confirmation objection, such gamesmanship is prohibited, and establishes intent and implied consent (to the court's authority) and constituted a waiver of the right to make such argument, a finding that the court deemed to promote judicial efficiency and check gamesmanship).

15.     It is absurd for the Alleged Debtor to claim that the Petitioning Creditors somehow forfeited their right to appeal the Dismissal Order "through no one's fault but their own." PPDP Obj. to Cross Motion at ¶8.  In fact, it was the Alleged Debtor's silence regarding its fee request in light of the Court's rejection of the Alleged Debtor's proposed dismissal order, the language of the Court's Dismissal Order and the related Dismissal Opinion (neither of which

granted fees, preserved the Alleged Debtor's right to request fees, nor retained jurisdiction over the matter), and the closing of the case that made clear to the Petitioning Creditors the Alleged Debtor had waived its section 303(i) rights.

16.    PNA, on the other hand, within hours of receiving the Alleged Debtor's second motion for fees and damages and seeking to protect its rights, sent the November 23rd letter to chambers informing the Court of its reading of the Dismissal Opinion and the case closing, and PNA sought and was granted a chamber's conference during which this Court explained its "mistake" and provided a procedure to address the problem. The Alleged Debtor's conduct compared to PNA's conduct is telling.

17.    The Third Circuit has found that, while a waiver is the "intentional relinquishment or abandonment of a known right or privilege," *conduct*, not just stated intention, can demonstrate waiver of a claimed right. *Evco Leasing Corp. v. Ace Trucking Co.*, 828 F.2d 188, 195 (3rd Cir. 1987) ("A waiver need not be asserted directly or expressly. It is well-settled that waiver may be established by conduct inconsistent with claiming the waived right . . .") (citing *In re Garfinkle*, 672 F.2d 1340, 1347 (11 Cir. 1982) (setting forth standards for conduct that rises to a waiver of, and estoppel from, pursuing claims); *see also Millennium Lab,* 575 B.R. at 288 (finding intent to waive the right to argue a constitutional objection to the extent the creditor intentionally kept its objection in its back pocket to be used on appeal if it was not successful in its confirmation objection).

18.    Under the circumstances, if the Alleged Debtor intended to pursue its fee claims, it was utterly unreasonable for it to ignore the Dismissal Order and the closing of the case until after the appeal period expired. The only possible explanation was that it intended for the Petitioning Creditors to rely on the language of the Dismissal Order, the case closing, and the

Alleged Debtor's silence to refrain from filing an appeal of the Dismissal Order. Contrary to the Alleged Debtor's contention, the *Petitioning Creditors* had no reason to believe that the Dismissal Order (which was clear on its face) and the subsequent closing of the case needed clarifying – the *Alleged Debtor*, whose motion was being decided and proposed order was rejected, had that obligation. By conducting itself as if it did not intend to pursue the matter, the Alleged Debtor should be deemed to have waived its rights under Section 303(i) and estopped from reopening the case to reassert its request for fees and damages. *See, cf., Millennium Lab,* 575 B.R. at 288 (if creditor intentionally kept its constitutional objection in its back pocket to be used on appeal if it was not successful in its confirmation objection, such gamesmanship is prohibited, and establishes intent and constituted a waiver of the constitutional objection). This would promote judicial efficiency and checks gamesmanship. It would also permit the Foreclosure Action to proceed without delay.

19.    For these reasons and the reasons stated in the Objection and Cross Motion, the Petitioning Creditors respectfully submit that this Court should either deny the Alleged Debtor's request to reopen this case or, if this Court reopens the Alleged Debtor's case, it should either determine that the Alleged Debtor has waived or forfeited its right to again request costs and damages or fashion a remedy that preserves the Petitioning Creditors' rights to appeal the Dismissal Order.

## <u>CONCLUSION</u>

WHEREFORE, based on the foregoing, the Petitioning Creditors respectfully request that this Court enter an order either (i) denying the Alleged Debtor's request to reopen the case or clarify the Dismissal Order, or, if the Court grants the relief requested in the Motion to Reopen such that the Alleged Debtor is permitted to adjudicate its Fee Motion, (ii) reinstating the

Petitioning Creditors' right to file a notice of appeal of the Dismissal Order within fourteen (14) days of the date the order reopening the case or clarifying the Dismissal Order is entered and granting the Petitioning Creditors' request to reconsider the Dismissal Order and find that the Involuntary Petition should not be dismissed and/or the Involuntary Petition was not filed in bad faith, and (iii) granting such other and further relief as is just and proper.

Dated:  February 14, 2022
       Wilmington, DE

**VENABLE LLP**

*/s/ Daniel A. O'Brien*
Daniel A. O'Brien (No. 4897)
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Tel: 302.298.3535
Fax: 302.298.3550
daobrien@venable.com

and

Jeffrey S. Sabin, Esq.
Gary L. Rubin, Esq.
James E. Frankel, Esq.
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Tel: (212) 307-5500
Fax: (212) 307-5598
jssabin@venable.com
glrubin@venable.com
jefrankel@venable.com

*Counsel to the Petitioning Creditors*